PEOPLE v FLETCHER

Docket No. 229092. Submitted February 5, 2003, at Detroit. Decided February 10, 2004, at 9:10 A.M. Leave to appeal sought.

Michael J. Fletcher was convicted by a jury in the Oakland Circuit Court, Jessica R. Cooper, J., of second-degree murder and possession of a firearm during the commission of a felony. The defendant appealed, alleging several errors.

The Court of Appeals *held*:

1. The trial court did not err in denying the defendant's motion for a new trial or an evidentiary hearing on the ground of juror misconduct. The defendant failed to establish that the jurors impermissibly considered extrinsic evidence when they engaged in a reenactment based upon their collective recall of the trial testimony.

2. There is no merit to the defendant's claim that the jury impermissibly shifted the burden of proof away from the prosecution.

3. The court properly denied the defendant's motion to suppress evidence obtained during a search of the defendant's home office. The defendant's privacy interest in the contents of a brown, expandable envelope discovered in his office became sufficiently diminished under the circumstances presented to allow a police officer to make a cursory review of the items contained therein. The incriminating nature of the contents was readily apparent and in plain view once the contents were exposed. The envelope was lawfully seized, it was lawfully opened, and its contents were lawfully exposed and examined.

4. To the extent that the trial court erred in denying the defendant's motion to quash the charge of assault of a pregnant individual with intent to cause a miscarriage or stillbirth, the error was harmless as a matter of law. The defendant failed to establish that any error resulted in a miscarriage of justice or otherwise affected the outcome of the case.

5. The trial court did not use an unfair jury selection procedure. The prospective jurors and their replacements were randomly chosen by a computer, and the attorneys did not have the opportunity to manipulate the process to their advantage through peremptory challenges.

6. The trial court did not err in instructing the jury on second-degree murder. At the time of the trial, case precedent required an instruction in a trial such as this, where the defendant is charged with first-degree murder, on the necessarily lesser included offense of second-degree murder.

7. The evidence supports the conviction of second-degree murder.

Affirmed.

JURY — EXTRINSIC INFLUENCES — JUROR MISCONDUCT.

Courts may consider juror testimony to impeach a verdict where there is evidence to suggest that the verdict was affected by influences external to the trial proceedings; courts may not invade the sanctity of the deliberative process where the alleged misconduct relates to influences internal to the trial proceedings; any conduct, even if misguided, that is inherent in the deliberative process is not subject to challenge or review; a jury verdict may be challenged on the basis of juror misconduct only when the verdict is influenced by matters unrelated to the trial proceedings; the distinction between an external influence and inherent misconduct is not based on the location of the wrong; rather, the nature of the allegation determines whether the allegation is intrinsic to the jury's deliberative process or whether it is an outside or extraneous influence.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, *David G. Gorcyca*, Prosecuting Attorney, *Joyce F. Todd*, Chief, Appellate Division, and *Anica Letica*, Assistant Prosecuting Attorney, for the people.

*Brian M. Legghio* for the defendant.

Before: ZAHRA, P.J., and FORT HOOD and SCHUETTE, JJ.

ZAHRA, P.J. Defendant appeals as of right his jury trial convictions of second-degree murder, MCL 750.317, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant to life in prison for the second-degree murder conviction, to be

served consecutively to two years' imprisonment for the felony-firearm conviction.

Defendant raises six issues on appeal, one of which requires us to consider whether defendant's convictions should be set aside and a new trial granted or, in the alternative, whether defendant is entitled to an evidentiary hearing to determine whether defendant should be granted a new trial because of juror misconduct. Defendant relies on a nationally televised ABC television broadcast entitled *20/20 Downtown* to argue that the jury impermissibly conducted an experiment during jury deliberations that tainted the jury verdict. Accepting as true ABC's description of the jury's deliberations, we conclude the trial court properly denied defendant's motion for a new trial and request for an evidentiary hearing. The experiment about which defendant complains was nothing more than a reenactment by the jury of the events about which the jury heard testimony. Such conduct does not undermine a verdict, even if the jury's reenactment proves to be inconsistent with or contrary to the actual evidence presented at trial. We conclude there is no merit to this or any other issue presented by defendant. We affirm.

## I. FACTS AND PROCEDURE

Defendant and the victim, Leann Fletcher, were married in 1993 and had a daughter in 1995. In 1997, defendant became involved in an extramarital affair with Susan Chrzanowski, a local district judge. Thereafter, defendant exhibited a pattern of vacillation between continuing his marriage and ending his marriage to pursue his relationship with Chrzanowski. Defendant separated from Leann twice after August

1998, but reconciled and returned to the marital home both times. During this time, Chrzanowski informed defendant she was unwilling to continue her involvement with him if he were sexually active with Leann. Defendant assured Chrzanowski that he was not sexually active with Leann and that divorce was inevitable.

On the afternoon of August 16, 1999, defendant and Leann went to a shooting range. Defendant, who had owned a .45 caliber Smith & Wesson pistol for almost a year, had never before taken Leann to a shooting range. Defendant and Leann left the shooting range after Leann had fired the gun once. Shortly after returning home, defendant called 911 and reported that Leann had shot herself. Defendant informed the dispatcher that they had just returned from the shooting range and that the gun discharged while Leann attempted to reload it. Leann was dead before emergency medical services personnel and the police arrived.

The police immediately obtained a warrant that, in pertinent part, authorized the police to search and seize "[e]vidence of a fatal shooting including but not limited to any and all weapons and ammunition, spent casings, blood and/or any objects which may be on the premises which appear to have blood stains upon them . . . ." While executing the search warrant, Police Sergeant Thomas Cleyman found a complaint for divorce in defendant's desk and seized it, concluding it constituted evidence of a motive to murder Leann. Sergeant Cleyman then discovered photographs and correspondence between Chrzanowski and defendant and greeting cards of a romantic nature, all of which were contained in a brown,

expandable envelope found in the closet of an upstairs bedroom that defendant used as a home office. Sergeant Cleyman seized the envelope and its contents, concluding they were evidence of an extramarital relationship, which also constituted evidence of a motive to murder Leann. Thereafter, defendant was arrested for Leann's murder.

Defendant was charged with first-degree murder, MCL 750.316, assault of a pregnant individual with the intent of causing a miscarriage or stillbirth, MCL 750.90a, and two counts of felony-firearm, MCL 750.227b. The district court bound defendant over on all the charges. In the circuit court, defendant moved to suppress the contents of the brown, expandable envelope seized by Sergeant Cleyman from defendant's home office, arguing Sergeant Cleyman did not have probable cause to believe the envelope contained any of the items enumerated in the search warrant. The trial court denied defendant's motion to suppress the evidence, concluding the contents of the envelope were properly seized under the plain view doctrine.

Defendant also moved to quash the charge of assault with intent to cause a miscarriage. Defendant argued, among other things, that there was no evidence a miscarriage occurred, because the dissolution of an embryo at an early stage was not a stillbirth or miscarriage as required under the statute. The trial court denied the motion[1] and the case proceeded to trial.

---

[1] This Court denied defendant's application for leave to bring an interlocutory appeal of the trial court's denial of the motion to quash.

After the prosecution rested its case, the trial court granted defendant's motion for a directed verdict on the charge of assault with intent to cause a miscarriage, because the medical examiner had testified that Leann did not undergo either a stillbirth or a miscarriage as those terms are medically understood. The case was presented to the jury on the remaining charges of first-degree murder and felony-firearm. The jury returned a verdict of guilty of the lesser included offense of second-degree murder and felony-firearm.

In November 2000, more than four months after the jury rendered its verdict, ABC aired the *20/20 Downtown* broadcast. The episode was entitled "Final Verdict" and featured defendant's trial. It appears only ten of the twelve jurors who rendered the verdict were interviewed in conjunction with this television production.[2] The broadcast represented that at the early stages of deliberation, eight jurors believed defendant was guilty. The broadcast reported that while the jurors were skeptical of the prosecution's evidence, most of the jurors were convinced defendant sounded insincere in his 911 call. The broadcast

---

[2] We are highly suspect of assertions contained in a television broadcast, particularly where, as here, the purpose of the broadcast is primarily to entertain rather than objectively find facts that are legally germane to a criminal proceeding. Obviously, ABC did not air the complete interviews of all the jurors who participated in the broadcast. The interviews were edited to reveal only those portions of the interviews that ABC's programming editors concluded were relevant to the broadcast's entertainment purpose. Likewise, we are not privy to the full context and array of questions that led to the responses from jurors that ABC elected to air in its broadcast. Nonetheless, for purposes of resolving this appeal, we accept as true defendant's contention that ABC accurately described the jury deliberations.

further reported that additional deliberations persuaded all but one juror that defendant was guilty.

The hold-out juror, according to the broadcast, became convinced of defendant's guilt when the jury used the gun that inflicted the fatal wound to conduct several reenactments of the events about which testimony was offered.[3] The television broadcast suggested these reenactments caused at least the hold-out juror and perhaps other jurors to conclude that the location of the gun at the crime scene did not support the conclusion that Leann shot herself. Therefore, the hold-out juror concluded defendant must have shot Leann.

Following the broadcast, defendant moved for a new trial on the ground of juror misconduct during deliberations. Defendant argued that jurors' reenactments amounted to extrinsic evidence of unreliable and improper experiments that strongly influenced the jury to convict him. Defendant argued, in the alternative, that an evidentiary hearing should be conducted to investigate whether there was juror misconduct. The trial court denied the motion for a new trial and for an evidentiary hearing, concluding that the only evidence defendant presented in support of his claim of juror misconduct was the videotape of the *20/20 Downtown* broadcast, which was inadmissible hearsay evidence. The trial court further found that even if the jury deliberated in the manner depicted in the television broadcast, the jurors' conduct was not improper. This appeal followed.

---

[3] This gun was admitted in evidence and properly provided to the jury during deliberations.

II. ANALYSIS

A. JUROR MISCONDUCT DURING DELIBERATIONS

Defendant argues that the trial court erred in deny-
ing his motion for a new trial or an evidentiary hear-
ing based on juror misconduct arising from the con-
sideration of extrinsic evidence produced outside the
trial proceedings. Defendant alleges this behavior
deprived him of his Sixth Amendment rights of con-
frontation, to cross-examination, and to the assis-
tance of counsel.[4] Moreover, defendant maintains that
the jury, through its consideration of extrinsic evi-
dence, impermissibly shifted the burden of proof to
defendant.

Initially, we conclude, as did the trial court, that
defendant failed to present admissible evidence in
support of his motion for a new trial. The videotape
of ABC's *20/20 Downtown* broadcast is inadmissible
hearsay evidence that cannot support a claim of juror
misconduct. *People v Budzyn*, 456 Mich 77, 92 n 14;
566 NW2d 229 (1997). Defendant responds that, at a
minimum, he should be entitled to an evidentiary
hearing to determine whether the representations in
the ABC broadcast are meritorious. However, remand-
ing this case for an evidentiary hearing on this point

---

[4] Preliminarily, we must address the prosecution's claim that defendant
has waived this issue on appeal because, during closing arguments, defen-
dant urged the jury to attempt to reenact the facts supporting the people's
expert witnesses. We decline to conclude that this statement made during
closing argument amounts to a waiver of this issue by defendant. Defen-
dant does not maintain that the jury erred by attempting to recreate the
facts that were the subject of the testimony, as requested by his trial
counsel. Rather, defendant maintains that the jury's reenactment
exceeded the bounds of acceptable deliberation and instead amounted to
extrinsic evidence that subjected the jury to extraneous influences outside
the trial proceedings.

would be futile. As more fully explained in this opinion, even if we accept as true defendant's account of the jurors' deliberations, defendant has nonetheless failed to demonstrate that the verdict was affected by impermissible extrinsic evidence.

Traditionally, the "near-universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to impeach a jury verdict." *Tanner v United States*, 483 US 107, 117; 107 S Ct 2739; 97 L Ed 2d 90 (1987), citing 8 Wigmore, Evidence (McNaughton rev ed, 1961), § 2352, pp 696-697. The only recognized exception to this common-law rule related to situations in which the jury verdict was affected by extraneous influences. *Tanner, supra* at 117, citing *Mattox v United States*, 146 US 140, 149; 13 S Ct 50; 36 L Ed 917 (1892). Stated differently, where there is evidence to suggest the verdict was affected by influences external to the trial proceedings, courts may consider juror testimony to impeach a verdict. However, where the alleged misconduct relates to influences internal to the trial proceedings, courts may not invade the sanctity of the deliberative process.

Our justice system has long recognized the significant policy considerations that weigh against the admission of juror testimony to impeach a verdict:

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus

secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference. [*McDonald v Pless*, 238 US 264, 267-268; 35 S Ct 783; 59 L Ed 1300 (1915).]

These policy considerations also support the rule that invasions into the deliberative process should be limited to situations where there is evidence that influences external to the trial proceedings affected the verdict. *Tanner, supra* at 120.

The Michigan Supreme Court in *Budzyn, supra* at 88-90, set forth a procedure to determine whether extrinsic or external influences affect a jury verdict:

In order to establish that the extrinsic influence was error requiring reversal, the defendant must initially prove two points. First, the defendant must prove that the jury was exposed to extraneous influences. Second, the defendant must establish that these extraneous influences created a real and substantial possibility that they could have affected the jury's verdict. . . . If the defendant establishes this initial burden, the burden shifts to the people to demonstrate that the error was harmless beyond a reasonable doubt. We examine the error to determine if it is harmless beyond a reasonable doubt because the error is constitutional in nature. The people may do so by proving that either the extraneous influence was duplicative of evidence produced at trial or the evidence of guilt was overwhelming. [Citations omitted.]

Juror affidavits "may only be received on extraneous or outside errors, such as undue influence by outside parties." *Id.* at 91. Any conduct, even if misguided, that is inherent in the deliberative process is not subject to challenge or review. A jury verdict may be challenged on the basis of juror misconduct only

when the verdict is influenced by matters unrelated to the trial proceedings. In this regard, the Supreme Court explained:

> [T]he distinction between an external influence and inherent misconduct is not based on the location of the wrong, e.g., distinguished on the basis whether the "irregularity" occurred inside or outside the jury room. Rather, the nature of the allegation determines whether the allegation is intrinsic to the jury's deliberative process or whether it is an outside or extraneous influence. [*Id.*]

Applying this procedure here, we must first consider whether the jurors' reenactment with the gun amounted to an external influence that affected the jury verdict. In *Budzyn, supra* at 80-87, two Caucasian police officers were convicted of second-degree murder of an African-American man that occurred while the police officers were engaged in their police duties. The defendants claimed that the jurors in this highly publicized and racially charged trial were improperly influenced by media reports of an expected riot if the defendants were acquitted, by exposure during a jury recess to the film *Malcolm X*, which depicted a scene of Caucasian police officers beating an African-American man and numerous scenes of civil unrest, and by partly erroneous rumors that the police officer defendants had participated in the STRESS[5] unit of the Detroit Police Department. *Id.* at 90. Our Supreme Court concluded that these matters "were extraneous to the trial proceedings and did

---

[5] STRESS (Stop the Robberies Enjoy Safe Streets) was a special decoy unit widely accused of police brutality toward young African-American males. *Id.* at 90 n 12.

not result exclusively from juror misconduct inherent in the verdict." *Id.* at 92.

This case stands in sharp contrast to the misconduct that occurred in *Budzyn*. There, the movie *Malcolm X*, the warnings of riots, and the information on STRESS were never presented during trial. *Budzyn, supra* at 90. Thus, the *Budzyn* jurors clearly considered during their deliberations matters extraneous to the trial testimony. *Id.* By contrast, the jurors here based their deliberations exclusively on the testimony elicited during the trial. The jury considered testimony that Leann was probably sitting on the bed when she was shot and testimony from one witness about where the gun should have landed. The reenactment was closely intertwined with the deliberative process and was not premised on anything other than the jurors' collective account of the evidence presented in open court.

A jury was also found to have been influenced by an improper external influence in *Doan v Brigano*, 237 F3d 722, 725-727 (CA 6, 2001). In *Doan, supra* at 725-726, a defendant in an Ohio criminal proceeding was convicted of murdering his girlfriend's fifteen-month-old child. The defendant claimed that he had given the child a bath the night she died, and that he did not observe bruises on her body because the bathroom was too dark. *Id.* at 725. After the defendant was convicted, one of the jurors told the defense counsel that she had tested this allegation in her home by drawing bruises on herself with lipstick to see if they were visible in a dark room. *Id.* at 726-727. She later reported to the other jurors that the "bruises" were visible under these conditions. *Id.* at 727. The trial court denied a motion for a new trial

based on juror misconduct. *Id.* The defendant exhausted his appeals in state court and petitioned the federal court for habeas corpus relief. *Id.* The Sixth Circuit Court of Appeals concluded that the juror's experiment constituted an improper extraneous influence on the jury. *Id.* at 733.

This case is distinguishable from *Doan*, where the juror conducted the experiment on her own and, in effect, "testified" to the other jurors about her results. Indeed, the Sixth Circuit Court of Appeals in *Doan* stated that the juror acted as an "expert witness." *Id.* at 733. In contrast, here no juror conducted any type of reenactment outside the jury room or outside the presence of the other jurors. Instead, the jurors worked together throughout their deliberations to evaluate competing trial theories. The jurors were charged with the responsibility to talk the matter through, by mentally hypothesizing the events of the shooting. The jurors were free to consider and discuss any matter they believed important to the resolution of this case, including a discussion on where the gun should have landed if Leann shot herself. That one juror apparently simulated a fall off of a table in the jury room and dropped the gun during this simulation is simply an outgrowth of such mental hypothesizing.

The essence of defendant's argument is that the reenactment was an improper extraneous influence on the jury because it amounted to a faulty experiment that was unscientific and based on a mischaracterization of the evidence presented at trial. It is true the jury lacked information regarding the dimensions of the shooting scene and the exact placement of the furniture at the scene, and may have erro-

neously based their experimentation on crime-scene photographs that depicted Leann's body after it had been moved, rather than in the place where she landed after being shot. However, defendant's argument is without legal merit. The alleged wrongdoing by the jury is a risk of error that is inherent in the deliberative process. Such claims simply are not subject to review. *Tanner, supra* at 121; *Budzyn, supra* at 91. Where, as here, the jury bases its deliberation on the jurors' collective recall of the testimony presented at trial, the jury's verdict will not be set aside for alleged misconduct simply because the jury's interpretation of the evidence resulted in questionable or arguably faulty assumptions.

Likewise, defendant's claim that the jury impermissibly shifted the burden of proof away from the prosecution is without legal merit. That the jurors expressed some doubts about the prosecution's evidence is not reason to conclude that the jury shifted the burden to defendant. The jurors must consider the case in its entirety and may find a defendant guilty beyond a reasonable doubt despite finding that some of the prosecution's evidence lacks credibility. The *20/20 Downtown* broadcast suggests the jurors did not find defendant credible. Thus, it appears the jurors gave due consideration to all the evidence presented at trial and properly followed their instructions relating to the application of the burden of proof.[6] The trial court properly denied defendant's motion for a new trial.

---

[6] We acknowledge that one juror is quoted in the *20/20 Downtown* broadcast as saying, "We didn't have the evidence to show that [defendant] actually shot her, but we finally determined that it was—beyond a reasonable doubt that [Leann] did not shoot herself. Therefore, he must

## B. EVIDENCE SEIZED FROM DEFENDANT'S HOME OFFICE

Defendant next argues that Sergeant Cleyman unlawfully searched and seized the contents of the brown, expandable envelope discovered in defendant's home office. Defendant concedes that the police were lawfully in his home office and that Sergeant Cleyman lawfully opened the brown, expandable envelope and looked inside. However, defendant maintains that once Sergeant Cleyman looked inside the envelope, it should have been apparent to him that the contents of the envelope did not fall within the array of items enumerated in the search warrant. Defendant maintains that, at that point, Sergeant Cleyman should have closed the envelope and ceased any further intrusion into defendant's privacy. Defendant contends a "search" took place when Sergeant Cleyman removed and looked at the documents and saw they revealed defendant's extramarital affair.[7]

---

have." We find this statement to be ambiguous and legally immaterial to our analysis. The first portion of the statement—"[w]e didn't have the evidence to show that [defendant] shot her"—could reasonably be construed to mean there was no direct evidence defendant was the shooter and the evidence against defendant was purely circumstantial. The second portion of the statement—"it was—beyond a reasonable doubt that [Leann] did not shoot herself"—may suggest the jury shifted the burden to defendant to show beyond a reasonable doubt that Leann shot herself. However, the final portion of the statement—"Therefore, [defendant] must have [shot Leann]"—establishes that the jury concluded Leann was shot by the only other person in her home on the day of her murder—defendant. In any event, these issues are legally immaterial. Viewing these issues in a light most favorable to defendant, these alleged errors amount to nothing more than juror misconduct inherent in the deliberative process that cannot be established by juror testimony. *Budzyn, supra* at 91.

[7] Although not advanced by the prosecution, a valid argument may be made that Sergeant Cleyman was authorized by the search warrant to remove the contents of the expandable envelope and examine each item in detail, because the search warrant authorized the search and seizure of "any objects which may be on the premises which appear to have blood stains upon them . . . ." Thus, pursuant to the plain terms of the search

Defendant argues that the contents of this envelope, which produced evidence of his extramarital affair with Chrzanowski, should have been suppressed because they were the fruits of an illegal search. The prosecutor argues that the search and the seizure of the contents of the envelope were permissible under the plain view doctrine.

Both the federal and Michigan constitutions protect persons from unreasonable searches and seizures. US Const, Am IV; Const 1963, art 1, § 11; *People v Champion*, 452 Mich 92, 97; 549 NW2d 849 (1996). In *Champion, supra* at 101, our Supreme Court summarized the plain view doctrine:

> The plain view doctrine allows police officers to seize, without a warrant, items in plain view if the officers are lawfully in a position from which they view the item, and if the item's incriminating character is immediately apparent. *Horton v California*, 496 US 128; 110 S Ct 2301; 110 L Ed 2d 112 (1990); *People v Cooke*, 194 Mich App 534; 487 NW2d 497 (1992). A fundamental characteristic of the doctrine is that it is exclusively a seizure rationale. No searching, no matter how minimal, may be done under the auspices of the plain view doctrine.

We review a trial court's findings of fact in a suppression hearing for clear error. *People v Custer*, 465 Mich 319, 324; 630 NW2d 870 (2001). However, whether there has been a violation of the Fourth Amendment and application of the exclusionary rule resulting from a constitutional violation are matters of law that we review de novo. *Id.* at 326.

---

warrant, Sergeant Cleyman had the right to examine the contents of the envelope to determine whether any item was bloodstained.

In *Arizona v Hicks*, 480 US 321; 107 S Ct 1149; 94 L Ed 2d 347 (1987), the United States Supreme Court considered whether an impermissible search took place when a police officer, who was lawfully in the defendant's apartment under the exigent circumstance exception to the warrant requirement, moved components of a stereo to view their serial numbers. The United States Supreme Court rejected the prosecution's argument that there was no "search" or "seizure" when the officer moved the equipment to read the serial numbers. *Id.* at 325. The Supreme Court concluded that "taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy unjustified by the exigent circumstance that validated the entry." *Id.* The Supreme Court then considered the plain view doctrine. *Id.* at 325-326. The Supreme Court stated that because the officer went beyond looking at items in plain view and actually moved the item to see the serial number, the plain view doctrine did not apply. *Id.* The Supreme Court stated that probable cause was required before the police could extend the search. *Id.* at 326. The Supreme Court held that the plain view doctrine " 'may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges.' " *Id.* at 328, quoting *Coolidge v New Hampshire*, 403 US 443, 466; 91 S Ct 2022; 29 L Ed 2d 564 (1971).

In *Custer, supra* at 336, the Michigan Supreme Court distinguished *Hicks* when it considered whether a police officer who was conducting a lawful patdown search for drugs committed an illegal search

when he removed from the defendant's pocket and viewed three photographs that depicted the defendant's companion posed with large quantities of marijuana in the defendant's living room. When the officer removed the photographs from the defendant's pocket, only the backs of the photographs were visible and it was apparent to the officer that these photographs were not, as the officer had suspected, a piece of cardboard that contained an illegal drug known as blotter acid. *Id.* at 335-336. The defendant maintained that, pursuant to *Hicks*, the officer committed an illegal search when he turned the photographs over so he could view them, fully knowing at that time that the photographs were not illegal drugs. *Id.* at 333-334.

Our Supreme Court disagreed,[8] observing that the officer lawfully removed the photographs pursuant to the "plain feel" doctrine, which is analogous to the plain view doctrine. *Id.* at 331-332; see also *Minnesota v Dickerson*, 508 US 366; 113 S Ct 2130; 124 L Ed 2d 334 (1993); *Champion, supra* at 100-101. Because the officer had probable cause to suspect that the items he felt in the defendant's pocket contained blotter acid, he could lawfully seize them. *Custer, supra* at 332. Our Supreme Court then addressed whether the officer violated the Fourth Amendment when he turned the photographs over:

---

[8] Justice MARKMAN's opinion appears to have been approved by a majority of the Court. Chief Justice CORRIGAN and Justice TAYLOR joined Justice MARKMAN's opinion and Justice WEAVER wrote a separate concurring opinion in which she cautioned against construing the plain view analysis of *Champion* too broadly in the future. *Custer, supra* at 345. Justice WEAVER's concurring opinion does not criticize any aspect of the majority opinion and expressly concurs in the result reached by the majority.

In this case, when the officer turned the lawfully seized photographs over to examine their fronts, this was not a constitutional "search" for purposes of the Fourth Amendment. *At this point*, defendant's reasonable expectation of privacy in the outer surfaces of the photographs had already been significantly diminished, at least sufficiently to justify the officer's turning over and looking at the photographs. The photographs were already lawfully seized by the officer. Once an object is lawfully seized, a cursory examination of the exterior of that object, like that which occurred here, is not, in our judgment, a constitutional "search" for purposes of the Fourth Amendment. See [*Hicks, supra* at 325-326]. This is true because a cursory examination of the exterior of an object that has already been lawfully seized by the police will produce no *additional* invasion of the individual's privacy interest. [*Custer, supra* at 333-334 (emphasis in original).]

Our Supreme Court further observed that its decision permitted the police to move a lawfully seized object to look at its outer surface or exterior. *Id.* at 334 n 5. Our Supreme Court distinguished the turning over of the photographs from the moving of the stereo equipment in *Hicks*:

Again, we emphasize that the turning over of the photographs occurred only after the police had already lawfully seized them from defendant. The reason that the police, in this case, were allowed to turn the photographs over was because they already had valid possession of them. In *Hicks, supra* at 326, the United States Supreme Court held that the police could not move stereo equipment to see the serial numbers on it because the police lacked probable cause to believe it was contraband *before* they moved it. However, in this case, the Court of Appeals correctly determined that the photographs had already been lawfully seized by the police. Where *Hicks* involved a preseizure movement or action by the police, the present case involves a postseizure movement or action. The police cannot manipulate an object in order to determine whether it is

contraband; it must be immediately apparent from plain view or plain feel that the object is contraband. *Id.* In the present case, the police did not move the object to examine it more closely in order to determine whether it was, in fact, contraband; rather, the police already had probable cause to believe that it was contraband upon plain feel, and only after the object was validly seized did they move the object to examine it more carefully. Because the officer had already lawfully seized the photographs when he turned them over to examine their fronts, and because defendant's reasonable expectation of privacy in the outer surfaces of those photographs had, at the least, been significantly diminished, there was no constitutional "search" for purposes of the Fourth Amendment.

*     *     *

. . . The law should not turn on the serendipity of which side of the photographs were facing up when the officer removed them from defendant's pocket. Rather, the law turns on whether the officer's actions violated any of defendant's constitutional rights. We do not believe that they did. Regardless of which side of the photographs came out facing up or down, the officer could look at all the sides of the photographs without violating any of defendant's constitutional rights. Therefore, we conclude that the turning over and examining of the other side of the photographs by the police, under the circumstances of this case, did not deprive defendant of his constitutional rights under the Fourth Amendment of [the] United States Constitution or Const 1963, art 1, § 11. [*Custer, supra* at 335-338.]

Applying the above-described legal principles to the facts presented here, we conclude that the point when Sergeant Cleyman looked inside the envelope is analogous to when the police officer in *Custer* removed the objects from the defendant's pocket and saw from their back that they were photographs and not a blotter acid card. Just as the *Custer* defendant's privacy interest in the photographs became suffi-

ciently diminished to allow the officer to examine
them by turning the photographs over, defendant's
privacy interest in the contents of the expandable
envelope became sufficiently diminished to allow Ser-
geant Cleyman to make a cursory review of the items
contained in the envelope. Sergeant Cleyman testified
that he immediately recognized the woman in the
photograph as District Judge Chrzanowski and that
the romantic letters contained within the envelope
were on Chrzanowski's office stationery. Thus, the
incriminating nature of the contents of the expand-
able envelope was readily apparent and in plain view
once the contents of the expandable envelope were
exposed. The expandable envelope was lawfully
seized, it was lawfully opened, and its contents were
lawfully exposed. Sergeant Cleyman could therefore
lawfully examine the contents of the envelope. The
trial court did not err in denying the motion to
suppress.

### C. THE CHARGE OF ASSAULT OF A PREGNANT INDIVIDUAL WITH INTENT TO CAUSE A MISCARRIAGE OR STILLBIRTH

Defendant next argues that there was insufficient
evidence to bind him over on the charge of assaulting
a pregnant person with intent to cause a miscarriage
or stillbirth, and evidence relating to this charge
should not have been presented to the jury. Although
acquitted of this charge by a directed verdict, defen-
dant maintains the error was unduly prejudicial
because the jurors repeatedly heard testimony that
Leann was pregnant and that her child died with her.

This Court reviews for an abuse of discretion both
a district court's decision to bind a defendant over for
trial and a trial court's decision on a motion to quash

an information. *People v Hamblin*, 224 Mich App 87, 91; 568 NW2d 339 (1997). Whether the error is of constitutional proportion will turn on the specific facts of each case. Generally speaking, however, the erroneous denial of a motion to quash one count in a case involving multiple counts will result in a claim that unduly prejudicial and irrelevant evidence was presented to the jury. These claims of error do not rise to constitutional proportion. That is the case here. Thus, to the extent that the trial court erred in denying defendant's motion to quash the charge of assault of a pregnant individual with the intent to cause a miscarriage or stillbirth, defendant carries the burden of establishing that this preserved nonconstitutional error resulted in a miscarriage of justice under a " 'more probable than not' standard." *People v Carines*, 460 Mich 750, 774; 597 NW2d 130 (1999), quoting *People v Lukity*, 460 Mich 484, 497; 596 NW2d 607 (1999). More specifically, defendant must demonstrate that it is "more probable than not that the outcome [of his trial] would have been different without this error." *Lukity, supra* at 497.

For purposes of addressing this issue, we shall assume without deciding that the trial court erred by failing to grant defendant's motion to quash this charge before the commencement of trial. However, any error in this regard was harmless as a matter of law. Regardless of whether this charge was dismissed, the prosecutor would have introduced evidence of Leann's pregnancy, because it was highly relevant to the prosecution's motive theory. Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable

than it would be without the evidence." MRE 401; *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). Generally, all relevant evidence is admissible, unless otherwise provided by law, and evidence that is not relevant is not admissible. MRE 402; *Aldrich, supra* at 113. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403; *Aldrich, supra* at 113. Here, the prosecutor sought to prove defendant was motivated to murder Leann because her pregnancy jeopardized his relationship with Chrzanowski. Thus, because evidence of Leann's pregnancy was relevant to the murder charge, defendant has failed to establish that any error resulting from the trial court's failure to quash the charge of assault of a pregnant individual with the intent to cause a miscarriage or stillbirth resulted in a miscarriage of justice or otherwise affected the outcome of this case.

### D. JURY SELECTION PROCESS

Defendant next challenges the trial court's method of jury selection. Defendant argues that the jury selection was not random because a computer-generated list of potential jurors had pre-selected numerical designations from which the court seated the prospective jurors assigned to replace jurors dismissed in the selection process. Defendant maintains that this Court disapproved of this procedure in *People v Green (On Remand)*, 241 Mich App 40; 613 NW2d 744 (2000). Defendant argues that his constitutional rights

were violated by the procedure used to select his jury and that this selection process constitutes structural error that requires reversal without a showing of prejudice. We disagree.

We review de novo alleged violations of the jury selection process. *People v Schmitz*, 231 Mich App 521, 528; 586 NW2d 766 (1998). Likewise, the interpretation of court rules presents a question of law that we review de novo. *Marketos v American Employers Ins Co*, 465 Mich 407, 412; 633 NW2d 371 (2001). MCR 2.511(A)(2) provides the following method for selecting jurors: "In an action that is to be tried before a jury, the names or corresponding numbers of the prospective jurors shall be deposited in a container, and the prospective jurors must be selected for examination by a random blind draw from the container." MCR 2.511(A)(4) provides that "[p]rospective jurors may be selected by any other fair and impartial method directed by the court or agreed to by the parties." MCR 6.412(A) incorporates this procedure for criminal trials as well as civil trials.

Here, defendant contends that the trial court's jury selection procedure was improper because the replacement jurors were not randomly selected in the presence of defendant, but were instead randomly preselected and included in a printed list. Citing *Green (On Remand)*, defendant states that, although this Court declined to reverse a conviction on the basis of a trial court's use of a similar procedure, this Court prospectively precluded its use.[9]

---

[9] *Green (On Remand)* was decided on May 9, 2000, approximately one month before defendant's trial began. When defendant objected to the jury selection procedure, the trial court indicated that the method employed had been tacitly approved by the Michigan Supreme Court, and formal

In *Green (On Remand)*, *supra* at 42-43, the trial court seated fourteen prospective jurors in accordance with a random computer-generated list. The computer-generated list was available to both parties' attorneys. *Id.* at 47. After the defendant was convicted, he appealed his conviction on the ground that the jury selection procedure was improper. *Id.* at 41-42. This Court agreed and reversed, concluding that *People v Colon*, 233 Mich App 295; 591 NW2d 692 (1998), which followed *People v Miller*, 411 Mich 321; 307 NW2d 335 (1981), required automatic reversal for deviations from proper jury selection methods. *People v Green*, unpublished opinion per curiam of the Court of Appeals, issued June 25, 1999 (Docket No. 202259). Our Supreme Court, in lieu of granting leave to appeal, remanded the case to this Court "for consideration of whether the jury selection method utilized was fair and impartial under MCR 2.511(A)(4)." *People v Green*, 461 Mich 975 (2000).

On remand, this Court concluded that it was no longer bound by *Colon* and, under MCR 2.511(A), which was not in existence when *Miller* was decided, a deviation from the standard jury selection practice may constitute a "fair and impartial" means of selecting a jury. *Green (On Remand)*, *supra* at 45-48.

> Thus, although the *Miller* Court's disapproval of the "struck jury method" still remains viable, MCR 2.511(A)(4) obviously affects *Miller's* rule of automatic reversal with respect to deviations from the standard jury selection procedure that do not implicate a "struck jury method" or a

approval was pending. We surmise that the trial court anticipated the Supreme Court would again address *Green*. However, the prosecution has not presented us with any administrative order or other authority relating to Supreme Court approval of the procedure and we are aware of none.

defendant's right to exercise peremptory challenges pursuant to MCR 2.511(F). [*Green (On Remand), supra* at 46.]

This Court determined that, although the jury selection procedure in *Green* was flawed because it allowed some predictability in the selection process, the flaw was not fatal because the identity of the next prospective juror was not a certainty. *Id.* at 47. Therefore, the jury selection process did not violate MCR 2.511(A)(4) because it was a "fair and impartial" means of picking a jury and did not deprive the defendant of a fair trial. *Green (On Remand), supra* at 48. However, this Court ordered the Washtenaw Circuit Court not to employ this system in the future because the element of predictability was present. *Id.*

Defendant contends that the system used by the Oakland Circuit Court in this case denied his right to a fair trial because the court used this system even after *Green* expressly disavowed the procedure. The jury selection procedure used in this case was similar to the procedure used in *Green (On Remand), supra* at 47. However, in contrast to the procedure in *Green*, where the attorneys could consult the list to see which prospective juror would be chosen next, the attorneys in the present case did not have access to this information. Here, there was no risk the attorneys could manipulate the selection process through the exercise of peremptory challenges. Accordingly, the potential for unfairness and predictability present in *Green* was not present here. The mere fact that the random selection took place before the parties were assembled in the courtroom did not impinge on defendant's right to a fair trial and fair jury selection. The selection process here did not constitute a "struck jury method" or impede defendant's right to

peremptory challenges. Instead, it provided defendant a fair and impartial means of picking a jury, as directed by MCR 2.511(A)(4). *Green (On Remand)*, *supra* at 47-48.

### E. JURY INSTRUCTIONS FOR SECOND-DEGREE MURDER

Defendant argues that the trial court erred by instructing the jury on second-degree murder, because the evidence at trial did not support this instruction. We disagree. At the time of defendant's trial, the trial court was bound by *People v Jenkins*, 395 Mich 440, 442; 236 NW2d 503 (1975), overruled by *People v Cornell*, 466 Mich 335, 358; 646 NW2d 127 (2002), which required the trial court to always charge the jury with the necessarily lesser included offense of second-degree murder whenever a defendant was charged with the greater offense of first-degree murder. After defendant's trial and while his appeal was pending, the Supreme Court decided *Cornell*, in which the Court overruled *Jenkins* and held that the trial court is no longer automatically required to provide an instruction on the necessarily lesser included offense of second-degree murder, but "such an instruction will be proper if the intent element differentiating the two offenses is disputed and the evidence would support a conviction of second-degree murder." *Cornell*, *supra* at 358 n 13. However, the Supreme Court gave the *Cornell* decision "limited retroactive effect, applying to those cases pending on appeal in which the issue has been raised and preserved." *Id.* at 367.

Although the present case was pending on appeal at the time the *Cornell* decision was decided, defendant failed to preserve this issue by objection in the

trial court. In order to preserve an error in the giving or failure to give jury instructions, a party must make a specific objection on the record. MCR 2.516(C); *People v Sabin (On Second Remand)*, 242 Mich App 656, 657; 620 NW2d 19 (2000). Here, defendant requested the trial court to give an instruction that the court was mandated by law to give the second-degree murder instruction. This requested instruction was an accurate statement of the law under *Jenkins* and did not amount to an objection to the second-degree murder instruction.[10] Therefore, the propriety of charging the jury with the second-degree murder instruction was not properly preserved, and *Cornell* is inapplicable to this case. The trial court properly instructed the jury with regard to second-degree murder under the then-controlling *Jenkins* opinion.[11]

---

[10] Defendant's only other objection to the jury instructions was to an instruction regarding the deliberation element of first-degree murder. Defendant argued that, because the prosecution's theory was that defendant planned the murder in advance, it was inappropriate to instruct the jury that the deliberation required for first-degree murder "may be merely seconds." This objection was to the instruction regarding the deliberation element of first-degree murder and did not include any objection to the second-degree murder instruction.

[11] Defendant also argues that he had no notice he had to defend himself against the second-degree murder charge. However, because under *Jenkins, supra* at 442, a charge of first-degree murder required consideration of the lesser included offense of second-degree murder, the information served to give defendant adequate notice he would have to defend against a second-degree murder charge. *People v Darden*, 230 Mich App 597, 600; 585 NW2d 27 (1998).

Additionally, we note that even if *Cornell* applied to this case, the trial court properly gave the second-degree murder jury instruction. First, the first-degree murder charge required the jury to find a disputed factual element (premeditation) that was not part of second-degree murder. *Cornell, supra* at 357, 358 n 13. Second, it is conceivable the jury could have found that, rather than killing Leann according to a premeditated plan, defendant on a "spur of the moment" seized an available opportunity to kill her so Chrzanowski would not learn of Leann's pregnancy. Therefore, a

F. SUFFICIENCY OF THE EVIDENCE OF SECOND-DEGREE MURDER

Finally, defendant argues there was insufficient evidence to support his conviction of second-degree murder. "In reviewing a claim of insufficient evidence, this Court must view the evidence in the light most favorable to the prosecution and determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Akins*, 259 Mich App 545, 554; 675 NW2d 863 (2003). "The elements of second-degree murder are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Goecke*, 457 Mich 442, 463-464; 579 NW2d 868 (1998). "Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Id.* at 464. Malice for second-degree murder can be inferred from evidence that the defendant " ' "intentionally set in motion a force likely to cause death or great bodily harm." ' " *People v Bulmer*, 256 Mich App 33, 36-37; 662 NW2d 117 (2003), quoting *People v Mayhew*, 236 Mich App 112, 125; 600 NW2d 370 (1999), quoting *People v Djordjevic*, 230 Mich App 459, 462; 584 NW2d 610 (1998). Second-degree murder is a general intent crime. *People v Abraham*, 256 Mich App 265, 269; 662 NW2d 836 (2003).

Viewed in a light most favorable to the prosecution, the evidence was sufficient to establish that defendant killed Leann and intended to do so. Because

rational view of the evidence supported the second-degree murder instruction. *Id.*

there was no eyewitness testimony with regard to Leann's death, all the evidence presented against defendant was circumstantial. " 'Circumstantial evidence and reasonable inferences drawn therefrom may be sufficient to prove the elements of a crime.' " *Bulmer, supra* at 37, quoting *People v Jolly*, 442 Mich 458, 466; 502 NW2d 177 (1993). Defendant argues that the evidence presented at trial relating to the location and existence of blood and gunshot residue, as well as the location of the gun, the gunshot wound, and Leann's body, was inconsistent with defendant's guilt. However, the fact that some of this evidence may have supported defendant's argument that he did not commit the murder did not preclude the jury from concluding beyond a reasonable doubt that defendant was guilty of second-degree murder. "Even in a case relying on circumstantial evidence, the prosecution need not negate every reasonable theory consistent with the defendant's innocence, but merely introduce evidence sufficient to convince a reasonable jury in the face of whatever contradictory evidence the defendant may provide." *People v Konrad*, 449 Mich 263, 273 n 6; 536 NW2d 517 (1995).

Defendant contends that the evidence was inconclusive and inconsistent with his guilt. In making this argument, defendant challenges the testimony of several witnesses and argues the testimony does not conclusively show that he murdered Leann. For example, defendant challenges the testimony of expert forensic scientist David Woodford. Specifically, defendant questions Woodford's finding of microscopic blood mist on defendant's shirt, and contrasts this blood mist on the shirt to blood mist found on a mirror, which was plainly visible. Defendant also challenges

Woodford's theory that Leann was shot while on her hands and knees beside the bed, and that the force of the bullet pushed her body upwards and laterally on top of the bed. Defendant also claims the presence of blood on Leann's leg and socks was inconsistent with Woodford's theory.

Defendant's numerous challenges to Woodford's testimony do not establish the insufficiency of the evidence. This Court will not interfere with the jury's role of determining the weight of the evidence or deciding the credibility of the witnesses. *People v Wolfe*, 440 Mich 508, 514-515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992). Despite the alleged deficiencies defendant points out with Woodford's testimony, the jury was free to conclude that Woodford was nonetheless a credible witness. Woodford testified it is not always possible to explain every bloodstain at a crime scene. Accordingly, the jury may have concluded that the alleged inconsistency between the blood mist found on the mirror and the blood mist on defendant's shirt, and Woodford's inability to explain the bloodstains on Leann's leg and sock simply were not material when considered against all the other forensic evidence presented at trial.

Moreover, although several defense witnesses rejected Woodford's theory that the force of the bullet moved Leann's body, the jury, as the judge of witness credibility, could have determined that Woodford and the medical examiner were correct when they testified that this movement was possible. Although different witnesses had varying theories about how Leann was shot, and there was conflicting testimony regarding matters such as whether there was blood mist on

defendant's shirt, all conflicts in the evidence must be resolved in favor of the prosecution. *People v Terry,* 224 Mich App 447, 452; 569 NW2d 641 (1997). Furthermore, although the witnesses conflicted over Leann's position at the time of the shooting, neither side's account can be conclusively tied to defendant's guilt or innocence.

Defendant also argues that there is insufficient evidence to show he intended to kill Leann, because malice is not implied merely because a deadly weapon was used, citing *People v Martin,* 392 Mich 553, 561-562; 221 NW2d 336 (1974), overruled in part on other grounds by *People v Woods,* 416 Mich 581, 621 n 12; 331 NW2d 707 (1982), and *People v Lyles,* 67 Mich App 620, 621-622; 242 NW2d 452 (1976). However, the cases cited by defendant hold that malice is a permissible inference that may be drawn by the jury. *Martin, supra* at 561-562; *Lyles, supra* at 621-622; see also *People v Carines,* 460 Mich 750, 759; 597 NW2d 130 (1999). In light of the evidence presented in this case, the jury was free to infer that, if defendant shot Leann, he did so maliciously.

The evidence presented was sufficient to prove defendant shot Leann. Defendant was the only person other than Leann who was present at the time of the shooting. Expert testimony established that Leann was shot from a distance of twelve to eighteen inches. Prosecution witnesses established that a woman with Leann's arm length could not point the gun at herself from this distance with her finger on the trigger. Additionally, defendant stated he had been in the bathroom when Leann was shot. However, high velocity blood mist was found on defendant's shirt cuff, and the medical examiner testified that no such

blood mist was found on Leann's hand. Expert testimony established that defendant could not have gotten blood mist on himself if, as he claimed, he was in the bathroom when Leann was shot. Thus, there was physical evidence supporting the conclusion that Leann did not shoot herself.

Furthermore, the jury could have inferred from the evidence that defendant cleaned himself up before calling 911. The evidence showed defendant touched Leann's body during the 911 call after asking if he should turn over Leann's body. Defendant continued to talk to the dispatcher and had a small amount of blood on his hands when the police arrived. When the police arrived, blood was found in the bathroom sink, indicating that defendant had washed his hands and that he had had a "fair quantity" of blood on his hands when he washed them. There was also a washcloth in the bathroom that was wet when the police arrived. From this evidence, the jury could infer that defendant killed Leann and attempted to wash away evidence of the murder before placing the 911 call.

Additionally, there was evidence defendant had a motive to murder Leann. Leann was shot and killed days after she learned she was pregnant. Leann's pregnancy jeopardized defendant's relationship with Chrzanowski, who had told defendant she would not continue to see him if he was sexually active with Leann. Even if Chrzanowski would have continued her relationship with defendant despite Leann's pregnancy, a second child would have complicated defendant's departure from the marriage. This motive evidence bolstered the prosecution's case that the shooting was not an accident.

Defendant's arguments attack the credibility of the witnesses' theories and assertions of fact. Depending on which witnesses the jury believed, the physical evidence could support either the prosecution or the defense. Although defendant demonstrates that the physical evidence was susceptible to evaluation favoring either side, it was the jury's prerogative to decide which side it did favor. Additionally, the motive evidence strengthened the prosecution's case. Because credibility is for the jury to decide and we must view the evidence in a light most favorable to the prosecution, we conclude that the evidence was sufficient to support defendant's conviction of second-degree murder.

### III. CONCLUSION

First, the trial court did not err in denying defendant's motion for a new trial or an evidentiary hearing on the ground of juror misconduct. Defendant did not establish that the jurors impermissibly considered extrinsic evidence when they engaged in a reenactment based on their collective recall of the trial testimony. Second, the trial court did not err in denying defendant's motion to suppress evidence seized from defendant's home office. Third, defendant failed to establish that any error resulting from the failure to quash the charge of assault of a pregnant individual with the intent to cause a miscarriage affected the outcome of the trial. Fourth, the trial court did not use an unfair jury selection procedure. Prospective jurors and their replacements were randomly chosen by a computer, and the attorneys did not have the opportunity to manipulate the process to their advantage through peremptory challenges. Fifth, the trial

court did not err in instructing the jury on second-degree murder. At the time of defendant's trial, *Jenkins, supra* at 442, required an instruction on the necessarily lesser included offense of second-degree murder. Sixth, the evidence was sufficient to support defendant's conviction of second-degree murder.

Affirmed.