# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
November 9, 2017

Plaintiff-Appellee,

v

No. 333925
Oakland Circuit Court
LC No. 2016-257725-FC

KEITH DION WHEAT,

Defendant-Appellant.

Before: MURRAY, P.J., and FORT HOOD and GLEICHER, JJ.

PER CURIAM.

A jury convicted defendant of first-degree criminal sexual conduct, MCL 750.520b, and first-degree home invasion, MCL 750.110a(2), connected with the late night entry into the apartment of PB and an assault committed within. Defendant challenges the sufficiency of the evidence supporting his identification as PB's assailant and contends that the prosecution engaged in misconduct by revealing certain critical test results for the first time during his trial. We affirm.

## I. BACKGROUND

PB testified that at approximately 5:00 a.m. on July 2, 2013, a man entered her apartment while she was sleeping and forced her to perform fellatio. She described that she was sleeping on the couch near her apartment's doorway and awoke to find defendant straddling her chest. Defendant punched PB in the left eye and then held her down by her throat. Defendant forced her mouth open with his fingers and placed his penis inside. Defendant masturbated until he ejaculated and then told PB to swallow or he would kill her. At some point during this attack, PB asserted, defendant licked her ear. After the attack, defendant stood up and walked out of the apartment, stating, "We're going out for dinner." PB ran to the apartment next door. Her friend, Venus Jones, heard the commotion and came out of her apartment. She testified that PB was quite upset.

PB remembered seeing her assailant in the hallway of her apartment building the previous afternoon. The man was "not very tall" and was wearing a brimmed hat. PB testified that the man was speaking to her neighbor, Gracie Phillips. Jones also recalled seeing two strange men in the apartment building on the afternoon of July 1. These men knocked on the door of Mark Hayden. One of the men was wearing a hat and was a "taller person."

-1-

The responding officer took PB's shirt into evidence. He also swabbed PB's mouth. Later that morning, another officer took PB to the hospital where a nurse conducted a sexual assault examination. The nurse took another swab from inside PB's mouth and a swab of her ear where the assailant had allegedly licked her. Detectives sent the swabs from the nurse exam to the Michigan State Police forensic lab. The ear swab tested positive for saliva and DNA from an unidentified male. The forensic scientist conducted a database search for a match to the male DNA and received a hit for defendant. An initial test of the mouth swab collected during the nurse exam revealed the possible presence of seminal fluid. When tested further, however, no sperm cells were found.

The investigating detective forgot to send his buccal swab and the shirt for forensic testing, however. On the evening of the first trial day, the prosecutor discovered the error and sent the items the next morning to the Michigan State Police. Melinda Jackson testified that the mouth swab taken shortly after the alleged assault tested positive for the "possible presence of seminal fluid." Jackson then tested for prostate antigens and again received a positive result for the possible presence of seminal fluid. She did not detect any sperm cells in the sample taken by the detective, however. Further testing to gather DNA from the sample was not conducted.

Defendant took the stand at trial. He admitted that he was in PB's apartment building on July 1 and 2, 2013, visiting Hayden. Defendant spoke to Phillips on the afternoon of July 1, and exchanged phone numbers with her. He conceded that he encountered PB at approximately 5:00 a.m. on July 2. Defendant described that when he left Hayden's apartment, PB was sweeping the carpet in the hallway despite that it was clean. PB told defendant to "wait a minute," accused him of sneezing on her shirt, and spit at him. In retaliation, defendant contended, he spit at PB, with his expectorant landing on her ear. He also shoved her face in the wall. As defendant left, he stated, "F you bitch, you need to go get a blow job."

The jury credited PB over defendant and convicted him as charged. He now appeals.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant contends that the prosecution presented insufficient evidence to prove that he committed the charged crimes. Specifically, defendant argues that the evidence was insufficient to prove that he was PB's assailant and that the inconsistencies in PB's stories prevented a jury from convicting him beyond a reasonable doubt. "A challenge to the sufficiency of the evidence in a jury trial is reviewed de novo, viewing the evidence in the light most favorable to the prosecution, to determine whether the trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Gaines*, 306 Mich App 289, 296; 856 NW2d 222 (2014). "All conflicts in the evidence must be resolved in favor of the prosecution, and circumstantial evidence and all reasonable inferences drawn therefrom can constitute satisfactory proof of the crime." *People v Solloway*, 316 Mich App 174, 180-181; 891 NW2d 255 (2016) (citations omitted). It is the jury's sole province to weigh the evidence and judge the credibility of the witnesses and we will not interfere with those assessments. *Id*. at 180.

"[I]dentity is an element of every offense." *People v Bass*, 317 Mich App 241, 263; 893 NW2d 140 (2016) (citation and quotation marks omitted). "[Po]sitive identification by witnesses

may be sufficient to support a conviction." *People v Davis*, 241 Mich App 697, 700; 617 NW2d 381 (2000). Despite inconsistencies in identification testimony, a jury is free to conclude that a witness is nonetheless credible. *People v Fletcher*, 260 Mich App 531, 561; 679 NW2d 127 (2004). The credibility of identification testimony is also a question left to the jury. *Davis*, 241 Mich App at 700.

PB described at trial that she got a good look at her assailant as he straddled her chest, licked her ear, and forced his penis into her mouth. She remembered her assailant from the previous day in the hallway. Although Oakland County Sheriff's Detective Shawn Werner testified that PB told him she did not see her assailant's face during the assault, PB denied having told him that. Further, defendant testified that he encountered PB at 5:00 a.m. on July 2. Defendant claimed that PB spit on him and that he reacted by pushing her face into a wall and spitting on her. Defendant admitted that he spoke to Phillips in the hallway on July 1, as described by PB. A rational jury could have chosen to believe PB's version of events and the explanation of how defendant's saliva found its way onto her ear over the story told by defendant. Additionally, the jury could have rationally concluded that PB's testimony regarding her observation of defendant's face during the assault was more credible than Detective Werner's testimony regarding PB's statement. We may not interfere with the jury's assessment in this regard.

Defendant argues, however, that PB's "identification of [defendant] during the trial was inherently unbelievable for the simple reason that she could not identify him right after the assault" and that her difficulty with short-term and long-term memory led to many inconsistencies with the identification. It is true that PB could not identify defendant from a photographic lineup shortly after her assault. But PB did identify defendant at trial and forensic evidence definitively established that defendant's saliva was on PB's ear. If the jury believed that PB was sexually assaulted in her apartment, rather than pushed against a wall and spit on in the hallway, then physical evidence supported that defendant was the assailant. PB's clinical memory deficiencies were not fatal to the case.

Defendant also takes issue with the various inconsistent descriptions of the assailant's height given by PB and other witnesses. PB described the man she saw in the hallway on the afternoon of July 1 as "not very tall." Jones described this same man as a "taller person." Phillips corroborated Jones's description, claiming that the man she spoke to was 6'3" or 6'4". Defendant is actually 6'1". However, Detective Werner testified that witness descriptions of height and weight cannot be trusted "because people just don't get it." Here, two witnesses accurately described the height of the man they saw in their apartment building and DNA evidence identified defendant as the contributor of the saliva on PB's ear. Obviously, PB was a poor judge of height, but given the other evidence, the jury could have reasonably concluded that defendant was her assailant.

## III. PROSECUTORIAL MISCONDUCT

Defendant accuses the prosecutor of intentionally delaying in notifying him that the swab taken from PB's mouth by the responding detective had not been tested before trial and that late-secured testing revealed the possible presence of seminal fluid, but not sperm cells. The prosecutor had previously informed defendant that the swab and PB's shirt had been collected as

evidence. She notified defense counsel on the second day of trial that the material had just been tested. Defendant objected to the admission of this new evidence because defense counsel indicated during opening statement, "You're not going to see any DNA evidence having anything to do with semen." Defendant believed the new evidence would confuse the jury. However, he mischaracterized his opening statement during his objection: "I said that there will be no evidence of any, you know, DNA material from the complainant's mouth, even though this is exactly where the crime occurred." Had he been aware of the mouth swab and the possible presence of seminal fluid, "I certainly would have done something different in opening statement," defense counsel contended. Defense counsel specifically noted, however, that he was "not blaming anybody."

In lieu of declaring a mistrial, the court permitted defendant to question the witnesses about exactly when they discovered that the evidence had not been tested to clarify the timeline of events. Defense counsel responded, "Very well. . . . I can accept the Court's ruling."

In closing argument, the prosecutor noted that midtrial it came to light that the earlier mouth swab taken by the investigating detective had yet to be tested. The prosecutor continued that the parties did not have enough time to perform DNA analysis to match the sample to defendant, but

> What came from that is seminal fluid was present in her mouth. Seminal fluid being present in her mouth in addition to the same timeframe that the defendant's saliva is found in her ear. How does that support what [PB] is telling you?

Later, when discussing the elements of the crime, the prosecutor reiterated that a mouth swab taken close in time to the assault was "positive for seminal fluid."

In rebuttal argument, the prosecutor emphasized that new information had been gathered since opening statements but that late discovery "doesn't mean you discard it." Even though the evidence could not be fully tested to gather a DNA profile, the prosecutor asserted, it still had evidentiary value: "because it talks about that seminal fluid, that seminal fluid being found in her mouth." Defense counsel did not object to the prosecutor's statements during closing or rebuttal. On appeal, he contends that he was prejudiced by the prosecutor's statements that this evidence was conclusive.

As a general rule, we review claims of prosecutorial misconduct to determine "whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "Issues of prosecutorial misconduct are decided case by case, and this Court must examine the entire record and evaluate a prosecutor's remarks in context." *Id*. at 64. However, "[i]n order to preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). Defendant objected when the subject evidence was admitted but not on grounds of prosecutorial misconduct and raised no objection during closing arguments. Accordingly, defendant's challenges are not preserved and our review is limited to plain error affecting defendant's substantial rights. *Id*. " 'Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the

fairness, integrity, or public reputation of judicial proceedings.' " *Id*. at 475-476, quoting *People v Callon*, 256 Mich App 312, 329; 662 NW2d 501 (2003).

The prosecutor did not engage in misconduct by delaying in informing defendant that the subject evidence had not been tested. "A prosecutor has a duty to 'make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the degree of the offense[.]' " *People v Aldrich*, 246 Mich App 101, 111; 631 NW2d 67 (2001), quoting MRPC 3.8(d). MCR 6.201(H) requires the prosecutor to "promptly notify" the defendant when he or she "discovers additional information or material subject to disclosure." The prosecutor fulfilled her duties in this case.

Oakland County Sheriff's Deputy Robert Charleton's report containing information about the mouth swab and t-shirt was provided to defendant during discovery. Both the prosecutor and defendant believed that the swab and t-shirt taken into evidence by Deputy Charleton were sent to the Michigan State Police crime lab to be tested. Upon learning that this evidence was not tested, the prosecutor directed Detective Werner to take it to the crime lab for analysis. Detective Werner took the evidence to the lab on May 10, 2016 at 8:06 a.m., the morning after he discovered that the swab and t-shirt remained untested. The tests were performed that same morning and the results were relayed to defense counsel at approximately 11:00 a.m. Because the prosecution had the buccal swab and t-shirt analyzed and the test results were provided to defense counsel within three hours, the prosecutor promptly notified defendant as required by MCR 6.201(H). There simply is no record evidence that the prosecutor or the Sheriff's Office intentionally delayed in having the evidence tested.

Even if the prosecutor had violated MCR 6.201(H), defendant cannot establish the necessary prejudice to warrant a new trial. MCR 6.201(J) provides trial courts with substantial discretion and latitude to remedy discovery violations. "When determining an appropriate remedy for a discovery violation, the trial court must balance the interests of the courts, the public, and the parties in light of all the relevant circumstances." *People v Jackson*, 292 Mich App 583, 591; 808 NW2d 541 (2011) (citation and quotation marks omitted). We review for an abuse of discretion a trial court's selected remedy for a discovery violation. MCR 6.201(J).

The trial court, rather than declaring a mistrial or granting a continuance to test the seminal fluid for DNA, allowed defendant to cross-examine the witnesses to determine when the evidence was discovered and what the results were. Defendant cross-examined Detective Werner, Jackson, and Jessica Drager, a forensic scientist within the biology unit of the Michigan State Police forensic lab, about the previously untested mouth swab and t-shirt. Although defense counsel was concerned that the new evidence would confuse the jury when coupled with his opening statement, the court believed that cross-examination would remedy any confusion. Defense counsel was able to elicit from Jackson that the test results of the mouth swab indicated only the *possible* presence of seminal fluid and no sperm cells. Jackson testified that although seminal fluid contains DNA, this evidence had not been DNA tested. Defense counsel utilized Jackson's testimony during closing argument to support the defense theory that defendant was not PB's assailant and to cast doubt on the prosecution's case. Therefore, the trial court did not abuse its discretion in allowing cross-examination of the relevant witnesses rather than granting a mistrial or continuance.

Even if the prosecution's failure to disclose the new evidence qualified as prosecutorial misconduct, timely disclosure would not have changed the outcome of defendant's trial. The oral swab and slides taken by the nurse examiner had the same results as the previously untested buccal swab—positive for the possible presence of seminal fluid and no sperm cells present. The earlier collected mouth swab was cumulative in this regard.

Defendant also argues that the prosecutor engaged in misconduct by arguing in closing that the mouth swabs tested positive for the presence of seminal fluid, rather than the possible presence of seminal fluid. Prosecutors are "free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *People v Marshall*, 493 Mich 1020, 1020; 829 NW2d 876 (2013). But "a prosecutor may not argue facts not in evidence or mischaracterize the evidence presented." *People v Watson*, 245 Mich App 572, 588; 629 NW2d 411 (2000).

The prosecutor could have made her argument more clearly, but it was not erroneous. As noted, both the mouth swab taken by the detective and the nurse examiner tested positive for the possible presence of seminal fluid. The analyst was unable to confirm that the fluid was definitely seminal fluid because there were no sperm cells. The witnesses testified that the absence of sperm cells in this case was not surprising. PB's saliva would have immediately started to break down such cells. PB smoking a cigarette while waiting for the detective to arrive would have speeded up this process. Moreover, the nurse examiner testified that in cases of fellatio, she sometimes discovers sperm cells captured between the victim's teeth. PB did not have teeth to trap the evidence.

The key point in this case was to prove that defendant licked PB's ear during a sexual assault, rather than spit on her ear during a fight. The prosecutor argued that the presence of seminal fluid in PB's mouth swabs made a sexual assault more likely than the fight narrative. The prosecutor should have been more careful in phrasing her argument to reflect the "possible" presence of semen, but reviewed in context we discern no reversible error.

Defendant also takes issue with the prosecutor's argument that the DNA evidence presented was conclusive. Drager testified regarding the statistics surrounding DNA analysis "in order to show how rare or common these DNA types are in the general population." Drager testified:

> [I]n this case, the probability of selecting an unrelated individual from the general population that would have DNA types that match the additional DNA types from the ear swabs for the Caucasian population: 1 in 200 point 8 quintillion. For the African American population: 1 in 100 point 2 sextillion. For the Hispanic population: 1 in 16 point 05 sextillion. We calculate on the three most common groups found in Michigan to show that regardless of the ethnicity these DNA types are equally rare.

Drager further testified that the world's population is approximately "7 billion, which is a 1 followed by 9 zeros," while the statistic for African Americans was "1 in 100 point 2 sextillion, which, again, is a 1 followed by 21 zeros." These statistics establish the virtual certainty of the DNA results. And the prosecutor was free to argue her theory of the case—that defendant's

DNA found its way onto PB's ear during a sexual assault, not when defendant spit on PB during a fight.

We affirm.

/s/ Christopher M. Murray
/s/ Karen M. Fort Hood
/s/ Elizabeth L. Gleicher