# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellant,

v

DOMINIQUE ARNETT RAMSEY, JR.,

       Defendant-Appellee.

UNPUBLISHED
April 24, 2018

No. 334614
Saginaw Circuit Court
LC No. 15-041847-FC

Before: RONAYNE KRAUSE, P.J., and FORT HOOD and O'BRIEN, JJ.

PER CURIAM.

This case is before this Court on remand from the Michigan Supreme Court for consideration as on leave granted. *People v Ramsey*, 500 Mich 980; 893 NW2d 342 (2017). Following a jury trial, defendant was convicted of conspiracy to commit first-degree murder, MCL 750.157a; MCL 750.316. After defendant moved for a directed verdict of acquittal and a new trial, the trial court granted defendant's motion. The prosecution filed a delayed application for leave to appeal the trial court's order, and we reverse and remand for sentencing proceedings and for entry of a judgment of sentence consistent with the jury's verdict.

## I. FACTS

This case arises out of the homicide of Humberto Casas, who was gunned down in the early afternoon hours of Father's Day, June 21, 2015, at the intersection of Cumberland and Holland in Saginaw, Michigan. Defendant and Travis Sammons were jointly tried on charges of open murder, MCL 750.316, conspiracy to commit murder, MCL 750.157a, possession of a firearm by a felon, MCL 750.224f, and three counts of possession of a firearm during the commission of a felony, MCL 750.227b. The prosecution's theory at trial was that defendant drove the vehicle carrying Sammons, who fired the shots at Casas. Following the prosecution's case-in-chief, defendant moved the trial court for a directed verdict, arguing that no evidence placed him at the scene of the murder. The trial court denied the motion, acknowledging that the record evidence was sufficient to submit the case to the jury. Notably, the trial court stated, in pertinent part:

> If I look at the testimony that's been presented so far against Defendant Ramsey, I believe that, taken in – [sic] evidence in the light most favorable to the nonmoving party, which is the prosecution, there is a mixture for the jury to at

least consider as it relates to his guilt or innocence, and therefore, I'm going to deny the motion at this time.

Subsequently, the jury returned a verdict finding defendant and Sammons guilty of the conspiracy to commit first-degree murder charge, but not guilty on all other charges.[1] Defendant then renewed his motion for a directed verdict, also seeking a new trial, arguing that no evidence established that he was part of an agreement to participate in Casas's murder. The trial court thereafter granted defendant's motion. The thrust of the trial court's ruling was that the record evidence was devoid of any reliable direct or circumstantial evidence establishing that defendant was the driver of the vehicle carrying Sammons. The trial court also "conditionally" granted defendant's motion for a new trial, concluding that the jury's verdict was against the great weight of the evidence, resulting in a miscarriage of justice.

The prosecution filed a delayed application for leave to appeal and a motion for peremptory reversal in this Court, both of which were denied. *People v Ramsey*, unpublished order of the Court of Appeals, issued December 29, 2016 (Docket No. 334614). The prosecution then sought leave to appeal in the Michigan Supreme Court, which remanded the case to this Court for consideration as on leave granted. *People v Ramsey*, 500 Mich 980; 893 NW2d 342 (2017).

On appeal, the prosecution contends that the trial court erred in granting defendant's motion for a directed verdict of acquittal and for a new trial. We agree.

## II. STANDARDS OF REVIEW

This Court reviews de novo a trial court's decision on a motion for a directed verdict of acquittal. *People v Hammons*, 210 Mich App 554, 556; 534 NW2d 183 (1995). This Court also reviews de novo a challenge to the sufficiency of the evidence. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). "Considering all the evidence presented by the prosecution in the light most favorable to the prosecution, a directed verdict is inappropriate where a rational trier of fact could find that the essential elements of the crime charged were proven beyond a reasonable doubt." *Hammons*, 210 Mich App at 556. To determine on appeal whether the evidence was sufficient to support a criminal conviction, this Court must discern, viewing the evidence in the light most favorable to the prosecution, whether "a rational trier of fact could find that the prosecution had proved the crime's elements beyond a reasonable doubt." *People v Lane*, 308 Mich App 38, 57; 862 NW2d 446 (2014). Any conflicts in the record evidence are resolved in favor of the prosecution. *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). "Circumstantial evidence and reasonable inferences arising therefrom may be sufficient to prove the elements of a crime." *People v Avant*, 235 Mich App 499, 505; 597 NW2d 864 (1999). "This Court will not interfere with the jury's role of determining the weight of the evidence or deciding the credibility of the witnesses." *People v Fletcher*, 260 Mich App 531, 561; 679 NW2d 127 (2004). When deciding a defendant's motion for a directed verdict, "it is

---

[1] This Court affirmed Sammons' conviction. *People v Sammons*, unpublished opinion per curiam of the Court of Appeals, issues July 6, 2017 (Docket No. 332190).

not permissible for a trial court to determine the credibility of witnesses[,] . . . no matter how inconsistent or vague that testimony might be." *People v Mehall*, 454 Mich 1, 6; 557 NW2d 110 (1997).

Defendant also moved for a new trial pursuant to MCR 6.431(B), challenging the weight of the record evidence. "This Court reviews for an abuse of discretion a trial court's decision to grant or deny a motion for a new trial. An abuse of discretion occurs when the trial court renders a decision falling outside the range of principled decisions." *People v Powell*, 303 Mich App 271, 276-277; 842 NW2d 538 (2013) (quotation marks and citation omitted). *In People v Anderson*, ___ Mich App ___, ___; ___ NW2d ___ (2018) (Docket No. 334219); slip op at 5, this Court recently recited the applicable principles of law in determining whether a jury's verdict is against the great weight of the evidence:

> The test to determine whether a verdict is against the great weight of the evidence is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand. When a defendant claims on appeal that his convictions were against the great weight of the evidence,
>
> [c]onflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial. [U]nless it can be said that directly contradictory testimony was so far impeached that it was deprived of all probative value or that the jury could not believe it, or contradicted indisputable physical facts or defied physical realities, the trial court must defer to the jury's determination.
>
> Additionally, [i]t is the province of the jury to determine questions of fact and assess the credibility of witnesses. [Footnotes, citations and quotation marks omitted.]

## III. ANALYSIS

As noted above, the jury convicted defendant of conspiracy to commit first-degree murder. MCL 750.157a provides that "[a]ny person who conspires together with 1 or more persons to commit an offense prohibited by law, or to commit a legal act in an illegal manner is guilty of the crime of conspiracy. . . ." "The gist of conspiracy lies in the illegal agreement; once the agreement is formed, the crime is complete." *People v Seewald*, 499 Mich 111, 117; 879 NW2d 237 (2016) (citation, footnote and quotation marks omitted). As this Court recognized in *People v Jackson*, 292 Mich App 583, 588; 808 NW2d 541 (2011):

> A criminal conspiracy is a partnership in criminal purposes, under which two or more individuals voluntarily agree to effectuate the commission of a criminal offense. The individuals must specifically intend to combine to pursue the criminal objective, and the offense is complete upon the formation of the agreement. The intent, including knowledge of the intent, must be shared by the individuals. Thus, there must be proof showing that the parties specifically intended to further, promote, advance, or pursue an unlawful objective. Direct proof of a conspiracy is not required; rather, proof may be derived from the

circumstances, acts, and conduct of the parties. [Citations and quotation marks omitted.]

"The elements of first-degree murder are (1) the intentional killing of a human (2) with premeditation and deliberation." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010).

At trial, the prosecution called DyJuan Jones, who was an eyewitness to the shooting. Jones was travelling home from church with his mother, Felicia Little, sitting in the backseat of her vehicle, when he heard what he initially thought were firecrackers. As relevant to this appeal, Jones testified that the driver of the vehicle carrying the individual that shot and killed Casas was between 280 and 320 pounds. Jones observed the individual sitting in the vehicle from 25 to 30 feet away. According to Jones, the driver of the Jeep was wearing a "big, white T-shirt[,]" and had a long beard which extended to his collar. Jones identified the vehicle carrying the shooter that killed Casas as a silver Jeep. When he visited the Saginaw Police Department in the early evening hours following the shooting, Jones, after observing defendant and Sammons held individually in separate interview rooms, was able to identify Sammons as the individual that shot and killed Casas, but he did not identify defendant as the driver of the Jeep. Sergeant David Rivard with the Michigan State Police also testified that Sammons and defendant were placed in separate interview rooms at the Saginaw Police Department, and that Jones positively identified Sammons as the shooter, but that Jones did not identify defendant.

Little testified that between 1:15 and 1:30 p.m. on June 21, 2015, she was driving northbound on Cumberland Street, approaching the intersection of Cumberland and Holland, when she saw a "body" come from behind a grey truck and a "guy" walking up the street. According to Little, the grey truck and a burgundy truck were parked in a nearby parking lot. Specifically, Little testified that she saw someone "come on the sidewalk and start shooting." However, according to Little, all she saw was "a body . . . and a hand and fire." Afraid for her safety and that of her son, Little sped away, so she did not see the shooter or the driver of the truck that the shooter came from behind, and therefore could not identify the shooter or the driver.

Rosei Watkins came upon the shooting as she and her eight-year-old grandson were driving home from visiting a local cemetery. Watkins observed three men on the side of the road, and she saw one of the men shoot one of the other men, while the third man got back in the driver's seat of a silver or grey Jeep. Specifically, Watkins described the Jeep as "box[y]." Given the circumstances of the shooting, Watkins was afraid for her grandson's safety, and quickly tried to manoeuver her vehicle away from the shooting, therefore she did not see the driver's face. According to Watkins, the driver of the Jeep "wasn't a real tall person[,]" and he was "in between" being of stocky and/or heavy and thin build. According to Watkins, the driver was of a "normal" build, and was not heavyset or in the range of 300 pounds. When questioned if the driver of the Jeep had a long beard, Watkins stated, "I don't remember seeing it." Watkins was not able to identify the driver of the Jeep or the shooter in a photographic lineup provided by the police on June 23, 2015.

Officer Bradley Holp with the City of Saginaw Police Department attended the scene of the shooting at approximately 1:15 p.m. after receiving a dispatch call about a shooting. When

he arrived at the scene of the shooting, Officer Holp observed Casas lying in the street with multiple gunshot wounds, one to the head, and noted that he was in possession of two cellular telephones and crack cocaine. Officer Tyler Poirer of the Bridgeport Police Department was working the day shift on June 21, 2015, and sometime between 1:15 and 1:35 p.m., as he was travelling northbound on Dixie Highway, he observed a silver Jeep Commander, and he noted that "based off some incident earlier that day, [he] had obtained some information regarding this car." Noticing that the silver Jeep had a defective brake light, Officer Poirer pulled the vehicle over, and defendant was driving the Jeep, and Sammons was his passenger. Officer Poirer recalled that defendant was wearing a white T-shirt. Officer Poirer also noticed during a pat-down search that Sammons's hands were "sweating heavily." When Officer Poirer searched defendant, Sammons and the silver Jeep, his search did not yield any firearms or drugs. Officer Poirer also described defendant's demeanor as normal. Officer Poirer also testified on recross-examination that defendant was not 320 pounds, and that he did not have a long beard that extended to his chin.

The prosecution also introduced as evidence a surveillance video mosaic, comprised of 11 different surveillance videos from varying locations, detailing the movements of the Jeep Commander in the time period contemporaneous with Casa's murder to the time that it was stopped by Officer Poirer. This evidence was admitted during the testimony of Detective Robert Scott with the Michigan State Police during the prosecution's case-in-chief. Specifically, the video commenced at the scene of Casas's murder, 1501 Cumberland Street, and shows the Jeep Commander entering the driveway at 1:21 p.m. where the homicide occurred. At one point during the surveillance video, at 1:26 p.m., the Jeep Commander stopped at 2573 Baldwin, a residential home, where it remained for 3 minutes and 12 seconds. The surveillance video shows 2573 Baldwin from about 400 yards away. Detective Scott attended 2573 Baldwin on June 26, 2015, and that is where Sammons was apprehended for his involvement in Casas's murder. Detective Scott was questioned extensively regarding the portion of the surveillance video mosaic at 2573 Baldwin. While the Jeep Commander was parked at 2573 Baldwin, Detective Scott noted that the passenger exited the vehicle and went into the house and then can no longer be seen in front of the house, and that no other vehicles pull into the driveway of the home at that time. The following colloquy took place between defendant's counsel and Detective Scott:

> *Q*. And let's pause it right there. Okay. Now, Detective Trooper, once again, no other cars pulled up, correct?
>
> *A*. Correct.
>
> *Q*. And at this time, we do not have a clear shot of the driver's side of the vehicle, correct?
>
> *A*. Correct.
>
> *Q*. And you don't see anyone walking down the street over here towards the end of Baldwin; do you?
>
> *A*. Doesn't appear so, no, sir.

Referring to another individual that was standing on the doorstep to the home at 2573 Baldwin, defendant's counsel further questioned Detective Scott as follows:

> *Q.* What is that that you see standing in front of the doorway?
>
> *A.* I'm not sure if someone exited the residence or – it appears someone's –
>
> *Q.* But it appears that there's someone standing outside of the door; correct?
>
> *A.* Yes.
>
> *Q.* But we don't see any other cars pull up, correct?
>
> *A.* Correct.

Defendant's counsel also confirmed with Detective Scott that after the passenger left the Jeep Commander and went inside 2573 Baldwin, another individual can be seen entering the home, and then later, multiple people are seen leaving the home.

> *Q.* So, Detective Scott, it appears from this video that we had two people enter this house; correct?
>
> *A.* Yes, sir.
>
> *Q.* And we had multiple people exiting the house; correct?
>
> *A.* Yes, sir.
>
> *Q.* And upon those multiple people exiting the house, the vehicle pulls off; correct?
>
> *A.* That's correct, sir.
>
> *Q.* And we can't tell with absolute certainty based on this vehicle evidence –based on the video evidence of who that is exiting the vehicle; can you?
>
> *A.* The only difference I can see between the people is one had a white shirt – or a white top on, and [the] other had a darker top on. That was the only difference that I could see from playing it over several times and getting as close to my computer screen as possible.

During cross-examination by Sammons's counsel, Detective Scott conceded that he could not describe the individuals getting in and out of the Jeep Commander at 2573 Baldwin.

> *Q.* Okay. On the Baldwin [address], as we're seeing, you really can't – doesn't give a description of who the person was, just that a person, you know,

went into the house, another person came back out, or something of that nature; is that correct?

> *A.* That's correct.

> *Q.* You can't give a description of who, if anybody sitting in this courtroom or anybody else, was – was that person in the vehicle; correct?

> *A.* That would be correct.

> *Q.* And you cannot tell whether or not the people that left that Jeep there were the same people that left the house and got back into the vehicle; can you?

> *A.* Correct.

> *Q.* Okay. Could've been completely different people; you cannot testify any different, correct?

> *A.* That's correct, sir.

Subsequently, during redirect examination by the prosecution, Detective Scott answered the following inquiry regarding his observations of the individual that got out of the Jeep Commander at 2573 Baldwin:

> *Q.* Okay. And [a] lot of discussion about people—people leaving the residence. As I understood it, correct me if I'm wrong, the video, does it show more than one person exiting the vehicle or just the passenger?

> *A.* All I can observe is the passenger exiting the vehicle. It doesn't appear that the driver gets out of the vehicle.

Detective Scott was then questioned extensively by defendant's counsel during recross examination.

> *Q.* Now, Mr. Scott, you testified on cross-examination about the vehicle being parked at Baldwin Street; correct?

> *A.* Yes, sir.

> *Q.* And you couldn't ascertain from this vehicle whether or not it was parked or still running – or still running, I should say; correct?

> *A.* That's correct, sir.

> *Q.* So we don't know if it was stopped or if it was still running; right?

> *A.* Correct.

-7-

*Q.* And we clearly see the passenger side door open on that vehicle; correct?

*A.* Yes, sir.

*Q.* And because of the way the video is stationed, you can't see the driver's side of the vehicle; correct?

*A.* Correct.

*Q.* And we clearly see on this video the passenger go inside the house; correct?

*A.* Yes, sir.

*Q.* And after he goes inside the house, roughly 35 seconds later, we see another person appear on the doorstep, correct?

*A.* Yes, sir.

*Q.* And we didn't see any cars pull up at that time; did we?

*A.* Correct.

*Q.* So its's safe to – we could reasonably assume that the driver is standing outside of the vehicle when the passenger goes inside; correct?

*A.* You said we can assume the driver is standing outside the vehicle? Is that your question, sir?

*Q.* We can assume that there's another person outside the vehicle; correct?

*A.* I'm sorry sir. I don't –

*Q.* Did you personally see on this video where that second person came from?

*A.* From inside the house.

*Q.* So it's your testimony now that the second person came from inside the house and not from outside?

*A.* I don't believe I testified to that before, but yes.

*Q.* Let's go back to the video. If we can cue this up?

*A.* I'm sorry, sir, but I'm confused.

-8-

*Q.* You can just go back roughly 10 seconds. We can just stop it right here. Okay. Now if we look at the scene—if we can go back roughly five more seconds, all the way to two minutes. You can go back a little further. All right. Right here. Okay. Now, we don't see anyone standing outside of the vehicle; correct?

*A.* That's correct, sir.

*Q.* And we don't see anyone at the door; do we?

*A.* I believe there's someone in a white shirt and someone in a dark shirt standing there.

*Q.* Okay. So there's two people standing outside of the door at this time. If we can press "play."

*A.* I think the "play," it skips a little bit, but I believe they entered the house at that point in time.

*Q.* So press "pause." And right now, at this time, someone has entered the house. There's no one standing on the doorstep; correct?

*A.* Correct, sir.

*Q.* All right. Let's press "play" again. No cars pull up during this time; correct?

*A.* Correct.

*Q.* All right. Press "pause." So now, what is this standing in front of the door?

*A.* Appears the same two people, one in the white shirt and one in a dark shirt.

*Q.* So the two people went inside and then came right back out?

*A.* Yes, sir.

*Q.* So they went in and came right back out. That's your testimony.

*A.* Yes, sir.

*Q.* And that's consistent with what you said on direct examination?

*A.* I believe so. I –

*Q.* Okay. Press "play." Pause. Is there anybody out on the doorstep at this time?

*A.* No, sir.

*Q.* Okay. And you're able to tell me with absolute certainty that those people are the same people, or that's the same passenger that you saw exit the vehicle standing on the doorstep?

*A.* I can't say that, sir.

*Q.* You can't say that, but you can say that those are two people; correct?

*A.* Yes.

*Q.* And you don't know what two people those are; correct?

*A.* Correct.

*Q.* And if we've – you've testified that you saw multiple different shirts out there; correct?

*A.* Yes, sir.

*Q.* All right. Let's fast forward it to 3 minutes and 50 seconds. All right. And we can press "play" from here. Pause. Okay. Did it appear that the door just opened recently?

*A.* Yes, sir.

*Q.* Okay. You can play it again. And pause. And we saw the door open on the passenger side; correct?

*A.* Yes, sir.

*Q.* Now, you put in your report that you saw multiple people walk outside the house at this time; correct?

*A.* Correct.

*Q.* And it's true that multiple people do walk outside of the house at this time; correct?

*A.* Correct.

*Q.* And we can't see what's happening on the driver's side of the car; can we?

*A.* No, sir.

*Q.* We can't even tell who that was who got into the passenger side of the vehicle; can we?

*A*. Correct.

*Q*. But we did, once again, see multiple people exit the residence at roughly 3:50 on this video; correct?

*A*. Yes, sir.

In its written opinion and order granting defendant's motion seeking a directed verdict of acquittal, the trial court noted Jones's description of the driver of the Jeep Commander, as well as the fact that Little and Watkins could not identify the driver. According to the trial court, Jones's description "did not even come close to describing defendant who weighed approximately 140 pounds and had minimal facial hair when he was arrested following the shooting." Thus, it is clear that the trial court was troubled by the lack of direct evidence identifying defendant as the driver of the Jeep Commander. With regard to the circumstantial evidence against defendant, the trial court focused on the surveillance video, stating that "the occupants of the vehicle are not visible on the video. Further, unknown individuals appeared to exit and enter the vehicle while it was stopped on Baldwin before the traffic stop." Specifically, the trial court went on to state, in pertinent part, as follow:

> From the video, it is impossible to determine whether the individuals that were in the vehicle at the time of the traffic stop, Defendant and Sammons, were the same individuals that were in the vehicle before it arrived at the location on Baldwin.
>
> The uncertainties created by the video, coupled with the lack of any direct evidence implicating Defendant in a conspiracy, leads this Court to the conclusion that the evidence presented at trial was deficient as a matter of law to permit a rational trier of fact to find beyond a reasonable doubt that Defendant was a member of a conspiracy to commit first-degree premeditated murder. Therefore, in accordance with Defendant's right to due process of law, the Court will enter a directed verdict of acquittal on the charge of conspiracy to commit first-degree premeditated murder.

Contrary to the trial court's determination, we determine that the record evidence, viewed in the light most favorable to the prosecution, amply supported the prosecution's circumstantial case against defendant, as well as the jury's ultimate verdict finding defendant guilty of conspiring with Sammons to commit first-degree premeditated murder. While Jones may not have identified defendant, and his description of the driver of the Jeep Commander did not comport with defendant's physical appearance on the day of the murder, notably, Jones identified the vehicle carrying Casas's assailants to be a silver Jeep. Additionally, Watkins joined in the identification of the silver Jeep as transporting the individuals who carried out Casas's murder, while Little also recalled seeing a silver truck at the scene of the murder. Significantly, Jones clearly identified Sammons as the shooter who fired multiple shots at Casas, and in a very short time period following the murder, defendant and Sammons were apprehended, driving together with Sammons as the passenger, in the same Jeep Commander that the witnesses described as being at the scene of the shooting. Moreover, Watkins's description of the driver of the Jeep was consistent with defendant's physical appearance. Again, as the trial court recognized, Jones's description of defendant did not align with defendant's

-11-

physical appearance, and Jones, together with Watkins and Little, could not identify defendant as the driver of the silver Jeep carrying Sammons. However, the jury was presented with this evidence, and it was within the province of the jury to gauge the credibility of the witnesses, as well as the weight to be given to their testimony concerning the identification, or lack thereof, of defendant. *Fletcher*, 260 Mich App at 561.

Further, while defendant's counsel vigorously questioned Detective Scott about the surveillance video mosaic, in an effort to cast doubt on the prosecution theory that defendant was driving the Jeep Commander continuously from when Casas was shot to the time that defendant and Sammons were apprehended by Officer Poirer, we also note that the surveillance video mosaic was played for the jury's consideration. Therefore, any alleged inconsistencies and deficiencies regarding that evidence, including issues concerning what individuals could be seen exiting and entering the Jeep Commander, as well as the house located at 2573 Baldwin, were thoroughly canvassed before the jury, which carried the ultimate responsibility of determining what credence and weight to give to that evidence. *Id*. While we recognize the prosecution's case against defendant was indeed circumstantial, we conclude that the record evidence and all reasonable inferences drawn from that evidence, viewed in the prosecution's favor, with all inconsistencies resolved in favor of the prosecution, certainly gave the jury a reasonable basis to find that defendant was driving the Jeep Commander at the time that Sammons gunned down Casas. The record evidence was also such that the jury, by defendant's participation in the shooting, could find that defendant had the requisite intent to conspire with Sammons to commit first-degree murder. Therefore, the trial court erred in granting defendant's motion for a directed verdict of acquittal. For the same reasons, we hold that the trial court also abused its discretion in conditionally granting defendant's motion for a new trial where the record evidence did not preponderate against the jury's verdict to the extent that a miscarriage of justice has occurred. *Anderson*, ___ Mich App at ___; slip op at 5.

## IV. CONCLUSION

Accordingly, we reverse the trial court's order granting defendant's motion for a directed verdict of acquittal and conditionally granting defendant a new trial, and remand for sentencing proceedings and for entry of a judgment of sentence consistent with the jury's verdict. We do not retain jurisdiction.[2]

/s/ Karen M. Fort Hood
/s/ Colleen A. O'Brien

---

[2] Given our disposition of this appeal, we need not address the prosecution's claim that its motion for peremptory reversal was improperly denied in this Court.