*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MARCELL DJON DAVIS,

        Defendant-Appellant.

UNPUBLISHED
January 21, 2020

No. 343734
Ingham Circuit Court
LC No. 17-000114-FC

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DERABIAN B. CARTHELL,

        Defendant-Appellant.

No. 346123
Ingham Circuit Court
LC No. 17-000110-FC

Before: CAMERON, P.J., and SHAPIRO and SWARTZLE, JJ.

PER CURIAM.

In Docket No. 343734, defendant Marcell Djon Davis appeals his convictions by jury of first-degree felony murder, MCL 750.316(1)(b); armed robbery, MCL 750.529; and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced Davis to life imprisonment without the possibility of parole for murder, to 300 to 500 months' imprisonment for robbery, and to two years' imprisonment for felony-firearm. In Docket No. 346123, defendant Derabian B. Carthell appeals his convictions by jury[1] of first-degree felony murder; armed robbery; second-offense felony-firearm ("felony-firearm"), MCL

---

[1] Davis and Carthell were tried separately.

-1-

750.227b; carrying a concealed weapon (CCW), MCL 750.227; and felon in possession of a firearm (felon-in-possession), MCL 750.224f. The trial court, applying a second-offense habitual offender enhancement under MCL 769.10, sentenced Carthell to life imprisonment without the possibility of parole for murder, to 281 to 880 months' imprisonment for robbery, to five years' imprisonment for felony-firearm, to 46 to 90 months' imprisonment for CCW, and to 36 to 90 months' imprisonment for felon-in-possession. We affirm in both appeals.

The convictions arise from a shooting death and robbery in Lansing, Michigan, on November 21, 2016. Evidence showed that the homicide victim and the robbery victim were sitting in a Jeep in front of a marijuana dispensary when Davis and Carthell approached the vehicle. The robbery victim was in the driver's seat and the homicide victim was in the front passenger seat. The prosecutor's theory was that Carthell approached the passenger side of the vehicle and dragged the homicide victim from the vehicle while Davis opened the rear, driver's-side door, briefly entered the vehicle, and shot the homicide victim from inside the vehicle as he was bent over and turned away.[2] After the murder, Davis and Carthell robbed the robbery victim, and fled the scene. At Davis's trial, Davis's attorney argued that Davis had been misidentified as a perpetrator, and Carthell's attorney argued at Carthell's trial that Carthell had been misidentified as a perpetrator. Carthell and Davis were both convicted as charged and sentenced to terms of imprisonment. These appeals followed.

## I. DEFENDANT DAVIS (DOCKET NO. 343734)

### A. LAY OPINION TESTIMONY

Davis first argues that Detective Quincy Scroggins improperly identified Davis on surveillance footage from the marijuana dispensary and improperly invaded the province of the jury by giving an opinion on the ultimate issue to be decided in the case, i.e., the identity of the shooter. According to Davis, the improper opinion testimony violated MRE 701.[3] Davis did not object below to the testimony by Detective Scroggins that he now deems improper. As such, the issue of its admission is not preserved, *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007), and we review the issue for plain error affecting substantial rights, *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

---

[2] The robbery victim provided identification testimony, but he was not entirely sure which of the two perpetrators—Davis or Carthell—shot the homicide victim. The robbery victim testified that both perpetrators had guns. The juries at both trials were given an aiding-and-abetting instruction.

[3] Davis also argues that admission of the opinion testimony into evidence violated his right to due process and denied him a fair trial. However, because Davis has fully abandoned the constitutional argument on appeal, we need not address the argument. See *Prince v MacDonald*, 237 Mich App 186, 197; 602 NW2d 834 (1999).

Under the plain-error doctrine, reversal is warranted if a "clear or obvious" error occurred

that "affected the outcome of the lower court proceedings." *Id*. And even if this standard is satisfied,

> an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence. [*Id*. at 763-764 (quotation marks and brackets omitted).]

Davis contends that the alleged identification by Detective Scroggins of Davis on the surveillance footage was improper opinion testimony because the jury was in just as good of a position as Detective Scroggins to make an identification. Consequently, Davis argues that Detective Scroggins's testimony invaded the province of the jury.

MRE 701 provides that "[i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." However, "a witness cannot express an opinion on the defendant's guilt or innocence of the charged offense." *People v Bragdon*, 142 Mich App 197, 199; 369 NW2d 208 (1985). " '[W]here a jury is as capable as anyone else of reaching a conclusion on certain facts, it is error to permit a witness to give his own opinion or interpretation of the facts because it invades the province of the jury.' " *People v Drossart*, 99 Mich App 66, 80; 297 NW2d 863 (1980) (citations omitted); see also *People v Perkins*, 314 Mich App 140, 161-162; 885 NW2d 900 (2016) (citing *Drossart* for the same proposition), superseded in part on other grounds sub nom *People v Hyatt*, 316 Mich App 368; 891 NW2d 549 (2016).

In *People v Fomby*, 300 Mich App 46, 49-53; 831 NW2d 887 (2013), a police officer's narrative description of a surveillance video and the identification of suspects in still images captured from the video were held to be admissible lay testimony. On appeal, the defendant argued that because his identity was at issue, the officer's testimony invaded the province of the jury. *Id*. at 48. This Court disagreed, explaining that the testimony was "rationally based on [the officer's] perception" of the video because he had watched the video multiple times and had used it to produce the still images. *Id*. at 50-51. Furthermore, this Court held that the officer's testimony was "intended to provide a clearer understanding" of whether the suspects had visited the scene before the crime, noting that the original video was approximately six hours long and that the officer reached his conclusions only after scrutinizing the entire video several times. *Id*. at 51-52. Finally, this Court explained that the testimony did not invade the province of the jury because the officer did not identify a suspect in the video as the defendant. *Id*. at 53. Rather, he merely opined that the individuals seen in a video of the crime were the same individuals seen in the still photographs he created from earlier surveillance footage. *Id*.

Conversely, in *Perkins*, this Court held that the trial court's decision to allow an officer's opinion testimony was an abuse of discretion. *Perkins*, 314 Mich App at 160. The officer in *Perkins* affirmatively identified the defendant as the person shown in a surveillance photograph after the prosecutor asked the officer, "[C]an you tell us who is coming down these stairs when

you can see them?" *Id*. at 160-161. Citing MRE 701 and *Fomby*, this Court held that the officer's testimony "invaded the province of the jury" because the officer "affirmatively identified [the defendant] as the individual in the stairwell." *Id.* at 161. This Court distinguished the officer's testimony from "the witness in *Fomby* who testified that the individual in the video footage was the same individual in still images but did not specifically identify the defendant as the individual in the images . . . ." *Id.* The *Perkins* Court explained:

> [The officer] could properly comment that, based on his experience, the individual appeared to be concealing a weapon, but [the officer] should not have been allowed to identify [the defendant] as that individual. "[W]here a jury is as capable as anyone else of reaching a conclusion on certain facts, it is error to permit a witness to give his own opinion or interpretation of the facts because it invades the province of the jury." [*Drossart*, 99 Mich App at 80.] There was nothing about the images (i.e. poor quality of the images, defendant wearing a disguise) that necessitated [the officer]'s opinion. This is evidenced by the trial court's own statement during defense counsel's objection that "I would have no trouble making an identification myself." [*Perkins*, 314 Mich App at 161-162.]

However, because evidence of the defendant's guilt was "overwhelming" and his identity was not in dispute, the *Perkins* Court held that the error was "ultimately of no consequence." *Id*. at 162-163.

The surveillance footage at issue in this case shows that the homicide victim and the robbery victim were sitting in a car parked in front of the marijuana dispensary and that they remained there for close to 40 minutes. The robbery victim was seated in the driver's seat and the homicide victim was seated in the front, passenger seat. After more than 38 minutes passed, the individual identified as Carthell was seen walking across the parking lot and away from the vehicle.[4] Later, the rear, driver's side door was opened. Because of the camera angle and the manner in which the vehicle was parked, only a portion of the rear, driver's side door was visible. The surveillance footage showed that the rear, driver's side door was opened, but it did not show what happened behind the door or in the backseat of the vehicle. Almost immediately after the rear door was opened, the suspect identified as Carthell approached the front, passenger side door. The front, passenger side door was opened, and a physical struggle between the homicide victim and the individual identified as Carthell ensued, resulting in the removal of the homicide victim from the Jeep. After the homicide victim fell to the ground, the rear, driver's side door closed and the individual identified as Davis walked from the rear of the vehicle toward the passenger side, where the homicide victim was located.

Detective Scroggins investigated the crimes at issue in this case. Before Detective Scroggins testified at trial, the surveillance video was played for the jury. Detective Scroggins testified that he had viewed the surveillance video several times and had observed enhanced images from the footage. During Detective Scroggins's direct examination, the prosecutor

---

[4] Carthell's girlfriend identified him after she was shown photograph stills from the surveillance footage.

showed Detective Scroggins a series of photograph stills from the surveillance video. Detective Scroggins described the sequence of events based on the photograph stills. More specifically, he noted that the rear, driver's side door of the vehicle had been opened and that the suspect later identified as Carthell had approached the passenger side of the vehicle. Detective Scroggins testified that the homicide victim had his back to Davis at certain points in the video. Detective Scroggins described the struggle that took place between the individual identified as Carthell and the homicide victim, including the moment Detective Scroggins believed that the homicide victim was shot. Detective Scroggins believed that the "shot was actually taken from Marcell Davis at this particular time or during this period." Detective Scroggins noted that the rear, driver's side door of the vehicle closed at one point. Detective Scroggins then stated "At this point it appears that Marcell Davis is approaching the passenger side of the vehicle."

Davis argues that Detective Scroggins's identification testimony impermissibly invaded the province of the jury because the jury was equally positioned to identify Davis. We agree. Like the testimony of the officer in *Fomby*, Detective Scroggins's testimony was rationally based on his familiarity with the photograph stills because he testified that he had observed the video footage several times. See *Fomby*, 300 Mich App at 50-51. Thus, narration was helpful in providing the jury with a clearer understanding of what it was viewing and therefore helped them to understand the relevance of the photographs. See *id.* at 51-52. However, the photograph stills admitted at trial were of high quality. The events that transpired, including the struggle that ensued between the person identified as Carthell and the homicide victim and the opening of the rear, driver's side door, was depicted clearly in the footage. After the homicide victim fell to the ground, a tall, slender individual was seen moving from the rear of the vehicle to the front, passenger side door, where Carthell was located. Unlike in *Fomby* and like in *Perkins*, Detective Scroggins specifically identified Davis as the individual who moved to the passenger side of the vehicle after the homicide victim was shot. Therefore, we agree that Detective Scroggins's testimony identifying Davis as the person depicted in the photograph stills impermissibly invaded the province of the jury. MRE 701; *Fomby*, 300 Mich App at 53. Indeed, "the issue of whether the defendant in the courtroom was the person pictured in a surveillance photo [is] a determination properly left to the jury." *Id.* at 52. There is no support in the record that Detective Scroggins was in any better position than the jury to make the identification. See *id.* at 52-53.

Even so, we disagree that this error affected Davis's substantial rights. "Substantial rights are affected when the defendant is prejudiced, meaning the error affected the outcome of the trial." *People v Jones*, 297 Mich App 80, 83; 823 NW2d 312 (2012). The primary purpose of Detective Scroggins's testimony was to explain the events depicted in the photograph stills, not to establish Davis's identity. Although Detective Scroggins did identify Davis, he only did so on two discrete occasions. Furthermore, before Detective Scroggins testified at trial, the robbery victim identified Davis as the man who opened the rear, driver's side door of the vehicle. The robbery victim indicated that Davis was holding a gun and wearing a black hooded sweatshirt and a hat. After viewing the surveillance video in the presence of the jury, the robbery victim identified Davis as the individual who could be seen walking from the rear of the vehicle to the passenger side after the homicide victim was shot. The robbery victim identified Davis as the suspect in the video wearing a dark colored shirt and a hat. The robbery victim testified at trial that he was 100 percent certain that Davis was the individual " in the black hoodie . . . ." In fact, the robbery victim also identified Davis in a photographic lineup, at the

preliminary examination, and at trial. The robbery victim testified that he saw Davis's face, that it was "hard to scratch [it] out [of his] memory," and that he saw Davis in his nightmares. Unlike Detective Scroggins, the robbery victim was in a better position than the jury to identify Davis in the surveillance video because he was present at the scene and testified that he was able to observe Davis. See *Fomby*, 300 Mich App at 52-53. Given these circumstances, we conclude that Detective Scroggins's references to Davis, although improper, did not substantially affect Davis's substantial rights. Therefore, this argument must fail.

Davis next argues that his trial attorney was ineffective for failing to object to Detective Scroggins's identification testimony because it usurped the role of the jury on the ultimate issue, i.e., the identity of the shooter. Davis failed to raise an ineffective assistance of counsel claim in the trial court in connection with a motion for a new trial or a *Ginther*[5] hearing. Therefore, our review of this issue is limited to mistakes apparent on the record. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). "To demonstrate ineffective assistance of counsel, a defendant must show that his or her attorney's performance fell below an objective standard of reasonableness under prevailing professional norms and that this performance caused him or her prejudice." *People v Nix*, 301 Mich App 195, 207; 836 NW2d 224 (2013). "To demonstrate prejudice, a defendant must show the probability that, but for counsel's errors, the result of the proceedings would have been different." *Id*. As already discussed, Detective Scroggins's testimony did not affect the outcome of trial. Therefore, there is not a reasonable probability that, but for counsel's failure to object to the testimony, the result of the proceedings would have been different. Because Davis cannot establish that he was prejudiced, his claim of ineffective assistance of counsel in relation to defense counsel's failure to object to Detective Scroggins's identification testimony must fail.

Davis next argues that Detective Scroggins provided improper testimony when he explained that his investigation led him to believe that Davis was the shooter because this was the ultimate issue to be determined by the jurors. We disagree. Although "a witness cannot express an opinion on the defendant's guilt or innocence of the charged offense," *Bragdon*, 142 Mich App at 199, "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact," MRE 704. In this case, the ultimate issue was whether Davis was present at the scene and shot the homicide victim. When Detective Scroggins was asked why he concluded that Davis shot the homicide victim, Detective Scroggins noted that Davis's DNA was located on 9-millimeter bullets that were found at a residence associated with Davis. Detective Scroggins also noted the statements of the robbery victim regarding the murder and robbery, the robbery victim's identification of Davis following a photo lineup, and the fact that a 9-millimeter bullet entered "the back side of [the homicide victim] and . . . exited from the chest area. . . ." Thus, Detective Scroggins's testimony was that, in light of all of this information, it was Davis, and not Carthell, who shot the homicide victim. Detective Scroggins did not testify that Davis was guilty of the charged crimes, all of which entailed consideration of legal criteria and elements other than discharge of a

---

[5] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

gun. Thus, because the evidence was not objectionable under MRE 704, we conclude that plain error did not occur.

Furthermore, even if plain error occurred with respect to this testimony, we conclude that Davis cannot establish that his substantial rights were affected given the overwhelming evidence of his guilt. Evidence at trial supported that Davis, Davis's brother, and Carthell made arrangements for Carthell and Davis to be present at the marijuana dispensary in order to rob the homicide victim. Prior to his death, the homicide victim identified Davis as the person who shot him, and the autopsy report revealed that his death was caused by a gunshot wound. More specifically, a 9-millimeter bullet entered in his right, lower back and exited on the left side of his chest. Testimony at trial supported that the trajectory of the bullet could have been caused by a shooter firing at the homicide victim's back, while he was bent over and leaning forward. The robbery victim testified at trial that Davis was the person who entered the rear, driver's side of the vehicle. The robbery victim further identified Davis as holding a gun at that time. After the homicide victim was shot, Carthell was identified as the person on the surveillance video going through the homicide victim's pockets. Davis held the robbery victim at gunpoint and took his wallet, cell phone, and keys. Davis and Carthell then fled the scene. The robbery victim identified Davis in a photographic lineup, at the preliminary examination, and at trial. The robbery victim testified that he saw Davis's face, that it was "hard to scratch [it] out [of his] memory," and that he saw Davis in his nightmares.

Forensic evidence further established Davis's involvement in the murder. A single, spent Luger 9-millimeter shell casing was located in the backseat of the vehicle. After executing a search of a residence associated with Davis, law enforcement located 15 Luger 9-millimeter cartridges. Davis's DNA was found on some of the 9-millimeter cartridges. Furthermore, tool marks on the spent shell casing recovered in the back seat of the Jeep matched tool marks on two of the Luger 9-millimeter cartridges that were found at the residence associated with Davis. Marks on the spent casing and two of the unfired cartridges were consistent with having been loaded into the same firearm magazine and chambered in the same firearm. Finally, as discussed below, after the crimes occurred, Davis fled from law enforcement on two separate occasions before he was finally apprehended. See *People v Unger*, 278 Mich App 210, 226; 749 NW2d 272 (2008) (holding that evidence of flight is admissible to show consciousness of guilt).

Because Davis cannot establish plain error affecting his substantial rights, this argument must fail. Consequently, Davis's claim that his trial counsel was ineffective for failing to object to Detective Scroggins's testimony that he believed that Davis shot the homicide victim must also fail. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) (holding that trial counsel is not ineffective for failing to make a futile objection).

## B. FLIGHT EVIDENCE

Davis contends that evidence and arguments about Davis's evasion of police should not have been allowed at trial because it was irrelevant and violated MRE 403.[6] We review this unpreserved issue under the plain-error doctrine of *Carines*, 460 Mich at 763-764.

A witness testified that the suspects ran from the scene of the shooting. Evidence was introduced that Davis fled from police in a vehicle and on foot on two occasions in the weeks after the murder-robbery. Also, a former police officer testified that Davis stated that, on the day of his arrest, he had intended to run from the arresting officers but did not flee because he saw a police dog. The prosecutor elicited testimony that multiple agencies had been looking for Davis. During closing arguments, the prosecutor argued:

> How does the evidence that [Davis] ran from the police on November 30, December 2nd fit in? How does the fact that he was planning to run on December 10 when he was located at 915 North Walnut fit in? Well, people can certainly run or hide for innocent reasons, such as panic, mistake, or fear. People may also run because they know they are guilty of the crimes that they are wanted for. People can also run and hide because they are conscious of their own guilt, and in this case that is exactly what the defendant did.

> The defendant has no duty to prove his innocence or do anything at all, but ask yourself, from a common sense perspective, who goes to such lengths to run and hide like this when so many people are looking for him? Is it the person who is just making a small mistake or is a little bit afraid or is having a small panic? Is it the person who is conscious of his own guilt, who knows what he did and knows what's coming next? Marcell had a good reason to run because the evidence did catch up to him.

The trial court gave the following instruction regarding flight:

> There has been some evidence that defendant tried to hide, ran away, or hid after the alleged crime or after the police tried to arrest him. This evidence does not prove guilt. A person may run or hide for innocent reasons such as panic, mistake, or fear.

> However, a person may also run or hide because of a consciousness of guilt. You must decide whether the evidence is true, and if true, whether it shows that the defendant had a guilty state of mind.

Evidence of flight is admissible to show consciousness of guilt. *Unger*, 278 Mich App at 226. Contrary to Davis's implication, there was indeed evidence of actual flight in the present case. Davis relies on the case of *People v Hall*, 174 Mich App 686, 691; 436 NW2d 446 (1989),

---

[6] Davis also argues that admission of the flight evidence violated his right to due process and denied him a fair trial. However, because Davis has fully abandoned the constitutional argument on appeal, we need not address the argument. See *Prince*, 237 Mich App at 197.

in support of his argument that the trial court should not have allowed evidence of him fleeing the police. However, in *Hall*, the evidence showed that the defendant did not "fear apprehension" but rather "merely walked away" from the crime scene after allegedly committing arson. The Court in *Hall* concluded that a flight instruction was therefore unwarranted. *Id*. In this case, a witness testified that the suspects "took off running," and there was additional evidence of Davis's attempts to evade police. Thus, *Hall* is clearly distinguishable.

Davis also relies on *People v Cammarata*, 257 Mich 60; 240 NW 14 (1932). In that case, the defendant had failed to appear before the trial court and had forfeited his bond on a number of occasions, and the prosecutor argued that this was "not consistent with innocence." *Id*. at 65. The defendant argued that the improper introduction of evidence of the forfeited bonds, "coupled with the argument of the prosecuting attorney," required reversal. *Id*. at 65-66. The *Cammarata* Court stated that "[e]vidence of flight is admissible," and it discussed various cases dealing with flight and with bond forfeiture. *Id*. at 66-72. The Court ruled, "Standing alone, evidence of bail forfeiture would not be admissible. In view of defendant's flight and arrest, which was not disputed, it was admissible as showing [the] defendant's subsequent conduct indicating consciousness of guilt." *Id*. at 74. Thus, *Cammarata* does not support Davis's position; rather, it supports the prosecution's position. Indeed, evidence of Davis's separate acts of flight was relevant to show consciousness of guilt. *Id*.; *Unger*, 278 Mich App at 226.

Davis contends that even if otherwise admissible, the evidence of flight should have been excluded under MRE 403, which states, in pertinent part, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]" The Supreme Court has explained that evidence is "probative" if it makes the existence of a consequential fact more probable than it would be without the evidence. *People v Feezel*, 486 Mich 184, 197; 783 NW2d 67 (2010). The Michigan Supreme Court has noted that MRE 403 does not prohibit prejudicial evidence but only prohibits evidence that is *unfairly* prejudicial. *Id*. at 198. This unfairness arises if there is a danger that marginally probative evidence will be given undue weight by the jury. *Id*. "[T]he prosecution does not have to use the least prejudicial evidence to make out its case." *People v Cameron*, 291 Mich App 599, 611; 806 NW2d 371 (2011).

Given that Davis's defense was misidentification, the evidence of consciousness of guilt made it more probable that Davis was the perpetrator. This evidence was highly probative, as opposed to merely marginally probative, and we therefore conclude that the evidence was not barred by MRE 403. Furthermore, any danger of *unfair* prejudice was lessened by the trial court's clear instruction that flight alone "does not prove guilt" and that a person may run for innocent reasons. *Id*. at 612. The prosecutor, too, noted that people sometimes run for innocent reasons, but then went on to argue that in this case, Davis's multiple fleeing incidents showed a consciousness of guilt. Given all the circumstances, there was no plain error with regard to the introduction of the flight evidence and the prosecutor's arguments about flight. *Carines*, 460 Mich at 763. Furthermore, for the reasons already discussed, given the overwhelming evidence of guilt, Davis would not be able to establish that his substantial rights were affected by the admission of the flight evidence. See *id*.

In addition, Davis has not established ineffective assistance of counsel in connection with this issue, given the admissibility of the evidence and the propriety of the prosecutor's arguments

about the evidence. Indeed, an attorney is not required to make futile objections. *Ericksen*, 288 Mich App at 201.

## II. DEFENDANT CARTHELL (DOCKET NO. 346123)

## A. ALLEGED EXTRANEOUS INFLUENCES ON JURY

Carthell argues that the trial court erred by failing to remove jurors and by denying his motion for a mistrial because his jury was exposed to extraneous influences that were not harmless.

We review a trial court's decision to grant or deny a mistrial for an abuse of discretion. *People v Alter*, 255 Mich App 194, 205; 659 NW2d 667 (2003). Likewise, we review for an abuse of discretion a trial court's decision regarding whether to remove jurors. *Unger*, 278 Mich App at 259. "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *Id*.

"A mistrial is warranted only when an error or irregularity in the proceedings prejudices the defendant and impairs his ability to get a fair trial." *People v Waclawski*, 286 Mich App 634, 708; 780 NW2d 321 (2009) (quotation marks and citation omitted). A defendant's right to a fair trial includes a right to a jury that is "fair and impartial." *People v Budzyn*, 456 Mich 77, 88; 566 NW2d 229 (1997). "Where the jury considers extraneous facts not introduced in evidence, this deprives a defendant of his rights of confrontation, cross-examination, and assistance of counsel embodied in the Sixth Amendment." *Id*. Consequently, "[t]he trial court must take appropriate steps to ensure that jurors will not be exposed to information or influences that could affect their ability to render an impartial verdict based on the evidence admitted in court." *People v Jackson*, 292 Mich App 583, 592; 808 NW2d 541 (2011).

However, a new trial is not required every time a juror "has been placed in a potentially compromising situation." *Id*. at 592-593. Rather, a defendant requesting reversal based on extraneous influences on the jury must establish two points. "First, the defendant must prove that the jury was exposed to extraneous influences. Second, the defendant must establish that these extraneous influences created a real and substantial possibility that they could have affected the jury's verdict." *Budzyn*, 456 Mich at 88-89 (citations omitted). "Generally, in proving this second point, the defendant will demonstrate that the extraneous influence is substantially related to a material aspect of the case and that there is a direct connection between the extrinsic material and the adverse verdict." *Id*. at 89. If the defendant meets this initial burden, the burden shifts to the prosecution to show that the error was harmless beyond a reasonable doubt. *People v Fletcher*, 260 Mich App 531, 540; 679 NW2d 127 (2004).

In this case, before the third day of trial, Juror No. 7 reported that a motor vehicle passed by her and Juror No. 5[7] when they were leaving the courthouse the night before; the driver of the vehicle honked the horn. Juror No. 7 thought that the car might have contained supporters of Carthell. Juror No. 7 said that she briefly discussed the incident with Juror No. 5 in the jury room. Carthell contends that this honking incident was prejudicial. Carthell also mentions that a spectator in the courtroom, who was a supporter of Carthell, had expressed discomfort that a supporter of the robbery victim had taken photographs of his truck.

On these facts, the trial court did not abuse its discretion by failing to grant a mistrial, or to take other action, based on Juror No. 7's disclosure to the court. Specifically, Juror No. 7 and possibly Juror No. 5 were exposed to an extraneous influence insofar as the honking incident which occurred outside the trial court proceedings. However, we conclude that the incident was not related to a material aspect of the case and, viewed objectively, this isolated incident did not create a real and substantial possibility of affecting the jury's verdict. See *Budzyn*, 456 Mich at 89 & n 10. After the trial court was notified about the incident, it questioned all of the jurors individually and outside of the presence of the other jurors. The questioning of Juror No. 5 and Juror No. 7 did not reveal any information or circumstances that suggested that their ability to render a fair and impartial verdict had been compromised. In fact, Juror No. 5 did not even disclose the honking incident, and Juror No. 7 was not even sure if the person who honked at her was a supporter of Carthell, and she actually indicated that she did not believe that Carthell "had anything to do with it." In addition, Juror No. 7 indicated under oath that she spoke about the incident only with Juror No. 5. When asked if it was "possible" that other jurors overheard the conversation, Juror No. 7 said, "Yes."

Importantly, Juror No. 5 and Juror No. 7 did not participate in deliberations; rather, they were excused as unnecessary alternates before deliberations pursuant to an agreement between the attorneys. The only evidence of an extraneous influence on deliberating jurors, therefore, was the *possibility* that other jurors overheard Juror No. 5 and Juror No. 7 discussing the honking incident. The specifics of any discussion are not apparent from the record. We conclude that the mere possibility of jurors having overheard a discussion about the honking incident—which even Juror No. 7 was not sure came from a supporter of Carthell—is not sufficient proof of an extraneous influence. See *Fletcher*, 260 Mich App at 540 (discussing the defendant's burden to prove an extraneous influence). Even if we were to assume, arguendo, that the possibly overheard discussion constituted an extraneous influence, Carthell has not demonstrated that it created a real and substantial possibility of affecting the jury's verdict. *Id.*; *People v Stokes*, 501 Mich 918; 903 NW2d 194 (2017). It would be a stretch indeed to conclude that jurors—none of whom expressed any concerns to the trial court upon specific questioning regarding the honking incident, but all of whom expressed the ability to be fair and impartial—were somehow materially influenced by the discussion between Juror No. 5 and Juror No. 7 about a honking incident that may or may not have been caused by supporters of Carthell. In addition, there is no

---

[7] Juror No. 7 never specifically identified Juror No. 5 as the juror who was with her when the honking incident occurred. However, the trial court's law clerk believed that Juror No. 7 was referring to Juror No 5.

indication or allegation that a supporter of Carthell who was in the courtroom had any interactions with any of the jurors. In fact, after learning of the honking incident, the trial court instructed everyone in the courtroom who was not court personnel to stay away from the jurors. Under these circumstances, the trial court did not abuse its discretion when it failed to declare a mistrial.

Carthell argues that the trial court erred by failing to engage in an analysis of whether the incident was harmless beyond a reasonable doubt. But this analysis is necessary only if a defendant first meets his or her burden of showing that there was an extraneous influence that created a real and substantial possibility of affecting the jury's verdict. See *Fletcher*, 260 Mich App at 540. Because Carthell did not meet this burden, this harmless-beyond-a-reasonable-doubt analysis was unnecessary.

### B. DEFENDANT CARTHELL'S STANDARD FOUR BRIEF

In a pro se supplemental brief filed pursuant to Supreme Court Administrative Order No. 2004-6, Carthell raises additional issues on appeal. We conclude that these issues have no merit.

### 1. DOUBLE JEOPARDY

Carthell contends that his convictions and sentences for both felony murder and the predicate felony of armed robbery violate protections against double jeopardy and that the armed-robbery conviction and sentence must be vacated. We review this unpreserved issue under the plain-error doctrine of *Carines*, 460 Mich at 763-764.

The United States Constitution and the Michigan Constitution both provide protections against double jeopardy. US Const, Am V; Const 1963, art 1, § 15. One such protection is the protection against multiple punishments for the same offense. *People v Nutt*, 469 Mich 565, 574; 677 NW2d 1 (2004). In *People v Miller*, 498 Mich 13, 17-18; 869 NW2d 204 (2015), the Michigan Supreme Court stated that "[t]he multiple punishments strand of double jeopardy is designed to ensure that courts confine their sentences to the limits established by the Legislature and therefore acts as a restraint on the prosecutor and the [c]ourts." (Quotation marks and citation omitted.)

Carthell relies on *People v Gimotty*, 216 Mich App 254; 549 NW2d 39 (1996), in support of his argument on appeal. It is true that in *Gimotty*, *id*. at 259, this Court concluded that the defendant's convictions and sentences for both felony murder and "the predicate felony of first-degree retail fraud" violated double-jeopardy protections. The Court, therefore, vacated the retail-fraud conviction and sentence. *Id*. at 260. In *People v Ream*, 481 Mich 223, 240-241; 750 NW2d 536 (2008), however, the Michigan Supreme Court overruled earlier Court precedent and concluded "that convicting and sentencing a defendant for both first-degree felony murder and the predicate felony does not violate the 'multiple punishments' strand of the Double Jeopardy Clause if each offense has an element that the other does not." The defendant in *Ream* was convicted of first-degree felony murder and the predicate felony of first-degree criminal sexual conduct. *Id*. at 241. The Court upheld both convictions and their sentences. *Id*. at 241-242. The Court stated that felony murder "contains an element not included in first-degree criminal sexual conduct, namely, the killing of a human being." *Id*. at 241. It then stated that "first-degree

criminal sexual conduct contains an element not necessarily included in first-degree felony murder, namely, a sexual penetration." *Id*. The Court explained that a sexual penetration was not a necessary element of felony murder because any number of felonies, not just those involving sexual penetration, can support a conviction of felony murder. *Id*.

The present case is analogous to *Ream*. Felony murder requires the killing of a human being, and armed robbery does not. In addition, armed robbery requires a larceny, see MCL 750.259 and MCL 750.530, but felony murder does not necessarily require a larceny, MCL 750.316(1)(b). In light of the Supreme Court precedent of *Ream*, Carthell's appellate argument is without merit.

## 2. VERDICT FORM AND ACCOMPANYING INSTRUCTIONS

Carthell contends that the verdict form used at his trial was defective because it did not have a "not guilty" option for second-degree murder, even though there was a "not guilty" option for all of the other charged offenses. However, this argument was waived. More specifically, the trial court asked if defense counsel was "satisfied with the reading of the jury instructions and the verdict form." Carthell's attorney answered, "Yes, Your Honor." Carthell is therefore not entitled to relief in relation to this argument. See *People v Carter*, 462 Mich 206, 209; 612 NW2d 144 (2000) (holding that waiver extinguishes the right to appeal an alleged error).

At any rate, no error occurred. The trial court instructed the jury regarding both first-degree felony murder and second-degree murder. The trial court stated, "If you find defendant guilty of murder, you must state in your verdict whether it is first degree felony murder or second degree murder." The verdict form listed five charges, the first of which was "Count 1 (Murder)." For Count 1, the options listed were "Not Guilty," "Guilty of First Degree Felony Murder," and "Guilty of Second Degree Murder." The remaining four counts had "Guilty" and "Not Guilty" options. The trial court instructed the jury that "[t]here's a line in front of each so one line will be filled out per count, just one." The jury convicted Carthell of all five offenses, choosing the first-degree felony murder option for Count 1.

MCL 750.318 states, in part, "The jury before whom any person indicted for murder shall be tried shall, if they find such person guilty thereof, ascertain in their verdict, whether it be murder of the first or second degree[.]" The court's oral instructions and the verdict form complied with this statute. The jurors were told that, with respect to murder, they could find Carthell guilty of first-degree murder, guilty of second-degree murder, or not guilty. The verdict form and instructions were not erroneous. Contrary to Carthell's argument on appeal, the verdict form in this case is not analogous to the flawed verdict form at issue in *People v Wade*, 283 Mich App 462, 465-468; 771 NW2d 447 (2009), wherein the verdict form and instructions provided a "not guilty" versus "guilty" option *only* for first-degree murder and then failed to provide a "not guilty" option for second-degree murder and manslaughter.

Although ineffective assistance of counsel is not mentioned in Carthell's statement of questions involved, he makes a brief argument regarding ineffective assistance in the body of his brief, contending that if this Court does not order a retrial, a remand is necessary to ascertain why defense counsel did not object to the jury instructions and the verdict form. Given, however, that the instructions and verdict form were proper, any objection would have been

-14-

futile. Counsel is not required to raise a futile objection. *Ericksen*, 288 Mich App at 201. Because Carthell has not set forth any facts that would require the development of a record to determine if defense counsel was ineffective, remanding the matter for a *Ginther* hearing is not necessary. *People v Williams*, 275 Mich App 194, 200; 737 NW2d 797 (2007), citing MCR 7.211(C)(1)(a).

We affirm in both appeals.

/s/ Thomas C. Cameron
/s/ Douglas B. Shapiro
/s/ Brock A. Swartzle